**Norman TIMBERLAKE, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9305–DP–577.

Supreme Court of Indiana.

Dec. 30, 1997.

Rehearing Denied April 30, 1998.

---

Judith G. Menadue, Norman, for Appellant.

Pamela Carter, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SELBY, Justice.

On July 20, 1995, Norman Timberlake ("defendant") was convicted of the murder of an Indiana State Police officer. On July 21, 1995, the jury recommended that death be imposed, and, on August 11, 1995, defendant was sentenced to death. In this direct appeal, defendant raises seven issues: 1) Whether there was insufficient evidence to sustain the verdict? 2) Whether prosecutorial misconduct denied him a fair trial? 3) Whether the trial court's actions denied defendant a fair trial? 4) Whether defendant received ineffective assistance of counsel? 5) Whether defendant was denied a fair and impartial jury? 6) Whether the sentencing order requires reversal? and 7) Whether defendant's sentence is inappropriate? Because we answer each question in the negative, we affirm the conviction and sentence.

## FACTS

In the early morning of February 3, 1993, defendant and Gerald Hill drove from New Albany, Indiana to Indianapolis in a dark Chrysler which belonged to a friend of defendant. While Hill was out of the car to make a phone call, defendant took Hill's .25 caliber gun from Hill's coat pocket and would not give it back. Defendant and Hill spent that day and night in Indianapolis. On February

4, 1993, defendant and Hill met Tommy McElroy in a bar. The three of them spent the day drinking and then drove to Lafayette, Indiana. On the morning of February 5, 1993, the three of them decided to drive back to Indianapolis. At some point during the drive, Hill separated from defendant and McElroy. Defendant, a tall and slender man, and McElroy, a slightly shorter and heavyset man, continued driving together.

At around 1:30 p.m., defendant and McElroy pulled over to the side of I–65 south so that McElroy could urinate. At the same time, Master Trooper Michael Greene, of the Indiana State Police, was driving north on I–65 and saw defendant and McElroy pulled over. Trooper Greene radioed his dispatch that he was going to check on two subjects stopped on the side of the road.

Defendant saw the police car and told McElroy that the police were coming. Shortly thereafter, Trooper Greene parked his car behind the Chrysler and approached McElroy. Trooper Greene asked defendant and McElroy for their driver's licenses and then had McElroy sit with him in the police car while he ran a license check. Defendant leaned on the car door and listened.

At 1:36 p.m., Trooper Greene called in for a driver's license check on the two subjects. At 1:38, the dispatcher radioed, in code, that defendant was not wanted. At 1:43, the dispatcher radioed, in code, that McElroy was wanted by the police. At 1:45, Trooper Greene radioed dispatch that he would be out of the car securing a subject who did not yet know that he was wanted. At 1:47, a woman's voice called dispatch from Trooper Greene's car and said, "Help an officer's been hurt, help." (R. at 3043.)

According to McElroy, Trooper Greene informed him that he would have to be arrested and told defendant that he was free to go. While Trooper Greene was handcuffing McElroy, defendant was sitting on the trunk of the Chrysler. Trooper Greene placed a cuff on McElroy's left hand and, as Trooper Green was bringing McElroy's right hand down to cuff, McElroy saw defendant come off the trunk, heard a "pop," and saw Trooper Greene slump down. McElroy saw a gun in defendant's hand. Defendant and McElroy ran to the car and drove off. Numerous passersby witnessed parts of the event.

McElroy drove them to a grocery store. McElroy entered the store and defendant ran off. McElroy, still with the handcuffs on his left arm, was arrested at the store. Defendant was arrested at a nearby lounge after a telephone operator, who had heard about the episode during her break, recognized his name when defendant tried to make a collect call for someone to come to pick him up. The police who arrested defendant found a gun in defendant's coat pocket. The gun in defendant's pocket was Hill's and was the gun that killed Trooper Greene.

## DISCUSSION

### I.

Defendant first argues that the evidence given at trial was insufficient to support his conviction. Defendant contends that the eyewitness testimony is not sufficiently conclusive to prove beyond a reasonable doubt that defendant was the person who shot Trooper Greene. Defendant further contends that the testimony of McElroy is "incredibly dubious" and cannot support a finding that defendant shot Trooper Greene.

Appellate review of a sufficiency of the evidence claim is well-established. As an appellate court, we will neither reweigh the evidence nor judge the credibility of the witnesses, as those are matters exclusively within the province of the jury. *Tillman v. State,* 642 N.E.2d 221, 223 (Ind.1994). Instead, we consider the evidence most favorable to the verdict, along with all reasonable inferences to be drawn therefrom, in order to determine whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* If substantial evidence of probative value exists to support each element of the crime, then we will not disturb the conviction. *Id.*

It is also well-established that the testimony of an accomplice, though subject to much scrutiny by the trier of fact, is alone enough to support a conviction. *See Garrison v. State,* 589 N.E.2d 1156, 1159 (Ind. 1992); *Pike v. State,* 532 N.E.2d 3, 5 (Ind.

1989); *Douglas v. State,* 520 N.E.2d 427, 428 (Ind.1988). The fact that the accomplice may not be completely trustworthy goes to the weight and credibility of the witness' testimony, something that is completely within the province of the trier of fact and cannot be reviewed on appeal. *See Garrison,* 589 N.E.2d at 1159; *Douglas,* 520 N.E.2d at 428.

■ In the present case, though McElroy is not, strictly speaking, an accomplice, his potentially self-serving testimony is similar to that of one accomplice testifying against another. Both situations contain the same credibility concerns. As defendant strenuously argues, the jury had to decide whether defendant or McElroy shot Trooper Greene, and a major piece of evidence against defendant was the testimony of McElroy. However, McElroy clearly testified that, as he was being handcuffed, he saw defendant get off the trunk of the Chrysler and walk up to Trooper Greene. Then McElroy heard a "pop," saw Trooper Greene go down, and saw defendant with a gun in his hand. The jury was aware that by believing McElroy it had to disbelieve defendant's innocence, but that decision is purely within the prerogative of the jury. Furthermore, McElroy's testimony is not uncorroborated. For example, two eyewitnesses testified that they saw the skinnier man (defendant) lunge at the officer and that, right after the movement, they saw the officer fall down. Also, the conviction is supported by circumstantial evidence in that defendant had possession of the murder weapon before the shooting and at the time of his arrest. While it is true that the various eyewitness testimonies contain inconsistencies, the resolution of those inconsistencies is for the jury, and not this Court, to decide.

■ Defendant argues, however, that McElroy's testimony is the lynchpin of the State's case and that we should invade the province of the jury because McElroy's testimony, under the "incredible dubiosity" rule, cannot be given any weight. Defendant correctly notes that an appellate court may infringe upon the jury's purview and reverse a trial court decision when confronted with "'inherently improbable' testimony or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'" *Till-*

*man,* 642 N.E.2d at 223. However, an appellate court takes this step only in situations "where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt." *Id.* As noted above, McElroy did not waver in his identification of defendant as the shooter, nor was his testimony unsupported by other witnesses or circumstantial evidence. The jury was aware of the inconsistencies and was faced with the responsibility of judging the credibility of the witnesses and determining what occurred. We find no reason to impinge upon their decision, nor do we believe that there was insufficient evidence to support the conviction.

## II.

Defendant next argues that he was denied due process and a fair trial due to prosecutorial misconduct. Defendant contends that the prosecutor committed misconduct by knowingly using false testimony, by misleading defendant as to when a key witness would testify, and by making improper arguments.

■ The determination of whether a conviction should be reversed due to alleged instances of prosecutorial misconduct rests upon the resolution of several questions. First, this Court must determine whether the prosecutor engaged in misconduct. If so, this Court must next determine "whether that misconduct, under the circumstances, placed the defendant in a position of 'grave peril.'" *Kent v. State,* 675 N.E.2d 332, 335 (Ind.1996). Grave peril is measured by the probable persuasive effect on the jury's decision, not by the degree of impropriety of the conduct. *Id.* Furthermore, "[e]ven if an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may still result." *Maldonado v. State,* 265 Ind. 492, 355 N.E.2d 843, 848 (1976).

## A.

Defendant contends that the prosecutor committed misconduct by knowingly using

the false testimony of John Robbins, Richard McPeake, and Roy Hood. Defendant's arguments concerning the three witnesses are as follows: (1) Shortly after the shooting, John Robbins gave a statement to the police that he had seen McElroy and defendant in his bar two days before the shooting and that he had heard *McElroy* tell Jim Gross (a patron) that, "The only good cop is a dead cop." (R. at 5204.) At trial, the State called Robbins as a witness, and he testified that *defendant* had made the anti-police statement; (2) At trial, Richard McPeake testified that he saw defendant, while sitting on the trunk of the car, pull a gun. Defendant asserts that this statement cannot possibly be true; (3) Roy Hood's testimony contains inconsistencies which defendant claims show his testimony to be false and fabricated.

 While the knowing use of perjured testimony may constitute prosecutorial misconduct, contradictory or inconsistent testimony by a witness does not constitute perjury. *See Evans v. State*, 489 N.E.2d 942, 948 (Ind.1986). In the present case, while the prosecutor presented witnesses who gave inconsistent accounts, there is no evidence that the prosecutor knowingly used false testimony. For example, Robbins testified at trial that he believed that he had made a mistake in his first statement and that it was defendant who made the anti-police statement. The prosecutor, knowing that Robbins' credibility would be thoroughly attacked, could believe that he was telling the truth. That does not amount to the knowing use of false testimony. Furthermore, defendant was not placed in grave peril as Robbins was thoroughly discredited as a witness. Defendant cross-examined Robbins on the inconsistency and, during defendant's case, had Jim Gross testify that McElroy made the statement and had the policeman who took Robbins' original statement testify that Robbins told him McElroy made the statement. With respect to McPeake and Hood, their testimonies

were substantially corroborated by the other witnesses. For example, both McPeake and Hood testified that they saw a thin man sitting on the trunk of a car parked in front of the police car. Hood also testified that he saw a stocky man standing with the police officer and that he saw the tall, skinny man make a move towards the policeman and raise his hand.[1] Several other witnesses testified to substantially the same descriptions. All of the witnesses were driving by at various speeds and at various distances from the scene; it is not surprising that their accounts vary slightly. There is no evidence that the prosecutor committed misconduct.

### B.

Defendant contends that the prosecutor committed misconduct by misleading defendant concerning when McElroy would be called as a witness. According to defendant, the prosecutor proposed that the parties provide each other with advance notice of witnesses and the order in which they would be called. The night before the second day of witness testimony, the prosecutor provided a list to defense counsel. Though the list did not contain McElroy's name, the prosecutor told defense counsel that McElroy might be called if the State finished with the witnesses on the list. The next day, the prosecutor called McElroy to testify before the State finished with the witnesses on the list. After the trial court denied a motion to reserve cross-examination until the next day, defendant waived cross-examination because he was unprepared.

Assuming that the facts are as stated by defendant, the prosecutor did not commit misconduct in this respect. As defense counsel conceded at trial, the prosecutor had no obligation to accommodate defendant concerning when a witness would be called. Defendant was fully aware that McElroy might be called on the day in question. Furthermore, even if the prosecutor committed mis-

---

1. McPeake also testified that he saw the thin man pull out a gun. Defendant claims that, because no one else testified to this and because the State never mentioned it again, the witness was lying and that the State committed misconduct by not correcting the statement at that moment. This testimony could be true, and, at the least, defen-

dant has not proven that the State knew it was using false testimony. Defendant also diagrams the inconsistencies presented by Hood. As defendant made clear during his cross-examination of Hood, there were inconsistencies. However, the basic points of his testimony remained the same and were corroborated by others.

conduct, defendant was not placed in "grave peril" because he was able to bring McElroy as a defense witness and examine his testimony at that point. Thus, there are no grounds for reversal here.

### C.

■ Defendant contends that the prosecutor committed misconduct by making improper statements during the guilt and penalty phases of the trial. Defendant argues that these statements provided the jury with arbitrary and irrelevant information to consider during their deliberations, thus denying defendant a fair trial. We first note that defendant failed to object to the statements at trial and, therefore, has waived any claim of error. *Bellmore v. State,* 602 N.E.2d 111, 120 (Ind.1992); *Maldonado,* 355 N.E.2d at 848. However, because defendant argues that his trial counsel was ineffective for failing to object to these comments, we will address this issue on its merits.

■ During argument, the prosecutor may argue and comment upon the evidence presented at trial. *See Miller v. State,* 623 N.E.2d 403, 407–08 (Ind.1993); *Woods v. State,* 547 N.E.2d 772, 781 (Ind.1989), *reh'g granted on other grounds,* 557 N.E.2d 1325 (Ind.1990). The prosecutor may not, however, imply that he has knowledge which the jury does not, nor may he claim to have special or personal knowledge. *See Miller,* 623 N.E.2d at 408. A comment based upon uncontradicted evidence is not equivalent to an impermissible comment upon a defendant's decision not to testify. *See Isaacs v. State,* 673 N.E.2d 757, 764 (Ind.1996).

■ Defendant makes reference to several comments made by the prosecutor during the opening and closing arguments of the guilt phase and during the opening argument of the penalty phase. For example, defendant argues that the prosecutor committed misconduct during opening argument by stating that the shooting was a "mean, sense-less, intentional act, the act of a man who hated authority, who hated the uniform and everything it stood for," (R. at 2978); that the prosecutor committed misconduct during closing argument by stating that there was no evidence to explain how defendant ended up with the gun if McElroy had done the shooting; and that the prosecutor committed misconduct during opening argument of the penalty phase by stating that defendant chose not to present mitigation evidence. In each alleged situation, the prosecutor made accurate and true statements based upon the evidence and the situation. The prosecutor never implied that he had knowledge which the jury did not, nor did he stray from the evidence and reasonable interpretations derived therefrom. There was no misconduct.

■ Defendant also contends that the prosecutor committed misconduct during the penalty phase by presenting cumulative and prejudicial evidence concerning the charged aggravator: that the victim was a police officer.[2] However, this evidence was relevant to proving the State's aggravating circumstance, and it did not go beyond proving the aggravator. Even if we were to agree that the evidence in question was cumulative, the evidence was not so inflammatory as to place the defendant in grave peril.

■ Defendant also contends that the prosecutor made improper comments during his closing argument at the penalty phase. Examples of these alleged improper comments are that the prosecutor told the jury that the death sentence was required by law, that the prosecutor commented on defendant's right not to testify, that the prosecutor told the jury that the responsibility for imposing the death sentence was his alone, that the prosecutor equated the death penalty with community self-defense, that the prosecutor implied defendant might get out of prison if not sentenced to death, that the prosecutor chastised defense counsel for crying for defendant, and that the prosecutor

---

**2.** The State had two witnesses testify to the fact that Trooper Greene was in fact a State Police officer and that he was on duty when he was killed. One witness, an officer who investigated Trooper Greene's murder, showed and explained to the jury the uniform Trooper Greene was wearing when killed. The other witness, the Superintendent of the Indiana State Police, testified that Trooper Greene had been a State Police officer for many years and that he was acting as a State Police officer when he was killed.

asked the jury to recommend death on behalf of others. For the most part, we do not agree with the implications which defendant attributes to what was said. Furthermore, even if we were to agree that some or all of the comments constituted misconduct, we do not believe that they placed defendant in grave peril. The argument, for the most part, summarized the facts and the law, and the few statements which may have departed from propriety were not stated in a manner or context which would incite the jury. In light of the evidence presented and the relatively minor nature of the actual comments, we do not think that the comments had any impermissible persuasive effect on the jury. *See Lowery v. State*, 640 N.E.2d 1031, 1038–39 (Ind.1994); *Woods v. State*, 547 N.E.2d at 781–82.

### III.

Defendant argues that he was denied a fair trial and sentencing determination by the trial court. He contends that various acts and omissions of the court denied him a fair trial, due process, an impartial jury, effective assistance of counsel, and a reliable sentencing determination.

### A.

Defendant claims that the trial court erred in sustaining the State's objection to the playing of a taped statement by witness John Robbins. As described earlier, the State called Robbins as a witness, and he testified that he had heard defendant make an anti-police statement to James Gross. Defendant wanted the jury to hear an earlier taped statement in which Robbins stated that McElroy had made the anti-police statement. Defendant argues that the tape was admissible to impeach Robbins.

 The standard of review for admissibility of evidence issues is abuse of discretion. *See Joyner v. State*, 678 N.E.2d 386, 390 (Ind.1997). Even if a trial court errs in a ruling on the admissibility of evidence, we will only reverse if the error is inconsistent with substantial justice. Ind.Trial Rule 61; *Joyner*, 678 N.E.2d at 390. Because we believe that any alleged error was harmless, we need not address the merits of defendant's

admissibility claim. After the State had Robbins testify that he heard defendant make the anti-police statement, defendant cross-examined Robbins and got Robbins to admit that he had earlier stated that McElroy made the comment and that he was now in training to be a reserve deputy for the Marion County Sheriff's department. Also, defendant called James Gross as a witness, and he testified that McElroy had made the statement to him. Finally, defendant called Detective Francis Shrock, the officer who took Robbins' original taped statement; Detective Shrock testified that Robbins had told him that he heard McElroy make the derogatory remark. As Robbins was thoroughly impeached as a witness and defendant suffered no prejudice, any error that the court may have made in sustaining the State's objection was harmless.

### B.

Defendant claims that the trial court erred by denying his request for a reservation of cross-examination on key witness McElroy. As described in section II(B), defense counsel asked the court to reserve cross-examination on McElroy until the next morning. The court denied the request but granted an afternoon recess. After the recess, defense counsel waived the right to cross-examine McElroy because counsel was unprepared.

 The constitutional right to confront witnesses includes the right to a full, adequate, and effective cross-examination; it is a fundamental element of and essential to a fair trial. *Lagenour v. State*, 268 Ind. 441, 376 N.E.2d 475, 478 (1978). While a trial court has discretion to regulate the scope of cross-examination, any regulation must comport with due process. *Pfefferkorn v. State*, 413 N.E.2d 1088, 1089 (Ind.Ct.App.1980). An actual restriction of cross-examination by the trial court may be a denial of defendant's rights. *See id.* However, if, given the opportunity to cross-examine a witness, a defendant does not, then defendant has waived his right. *See Pierce v. State*, 677 N.E.2d 39, 48 (Ind.1997).

 The trial court did not deprive defendant of his right to confront the witness.

The court did not impose any restrictions on defendant or deny him any avenues of questioning. Instead, the court allowed an unprepared defendant to take a recess in order to prepare for cross-examination. At that point, counsel made a tactical decision to waive cross-examination and, instead, to bring McElroy as a direct witness. Defendant called and questioned McElroy as a direct witness and there is no evidence that the court impinged on the examination.

## C.

Defendant claims that the trial court also erred by excluding relevant evidence concerning McElroy. Defendant wanted witnesses to testify that they had seen McElroy several days prior to the shooting and had heard him make threatening comments to people. The State objected on the grounds that the statements were irrelevant and unrelated to the present case. In response, defendant argued that the State had opened the door to evidence of how defendant and McElroy were acting by having Robbins testify to the anti-police statement and that the evidence was admissible to impeach McElroy. The court sustained the objection because the proposed testimony related to incidents too far removed in time from the shooting and because defendant was not with McElroy when the alleged statements were made.

■■■■■ The trial court is accorded wide discretion in ruling on the admissibility and relevance of evidence. *Hobbs v. State*, 548 N.E.2d 164, 166 (Ind.1990). We review a trial court's evidentiary decision for an abuse of discretion and will only reverse "where the decision is clearly against the logic and effect of the facts and circumstances." *Joyner*, 678 N.E.2d at 390. In the present case, the court could have found that the evidence was not relevant to the issue of who shot Trooper Greene or to the issue of who made the anti-police remark. We do not believe that the court abused its discretion. Furthermore, defendant successfully provided overwhelming evidence that McElroy, not defendant,

had made the derogatory statement about police. Thus, any error was harmless.

## D.

Defendant claims that he was denied a fair trial due to the manner in which the trial court treated the female member of his defense team. Defendant contends that the trial court made sarcastic and demeaning comments throughout the trial to the female attorney and that the court erred by not granting defendant's motion for a mistrial. These actions, defendant argues, prejudiced him because he was denied a fair trial before an impartial judge.

■■■■■ A trial before an impartial judge is an essential element of due process. *Abernathy v. State*, 524 N.E.2d 12, 13 (Ind.1988). The impartiality of a trial judge is especially important due to the great respect that a jury accords the judge and the added significance that a jury might give to any showing of partiality by the judge. *Abernathy*, 524 N.E.2d at 13. To assess whether the judge has crossed the barrier into impartiality, we examine both the judge's actions and demeanor. *Dixon v. State*, 154 Ind.App. 603, 290 N.E.2d 731, 741 (1972). However, we must also remember that a trial judge must be given latitude to run the courtroom and maintain discipline and control of the trial. *Id.*, 290 N.E.2d at 740. "Even where the court's remarks display a degree of impatience, if in the context of a particular trial they do not impart an appearance of partiality, they may be permissible to promote an orderly progression of events at trial." *Rowe v. State*, 539 N.E.2d 474, 476 (Ind. 1989). In short, defendant must show that the trial judge's action and demeanor crossed the barrier of impartiality and prejudiced defendant's case. *See McCord v. State*, 622 N.E.2d 504, 511 (Ind.1993).

■■■■■ In the present case, defendant provides numerous alleged instances where the trial court acted improperly towards defense counsel. Without addressing each one separately, we note that some of the comments clearly arose because of the judge's impatience with counsel.[3] Other of the comments,

---

**3.** For example, the judge became frustrated during voir dire with what he felt were unclear

questions and the misuse of questioning, though

at least from our reading of the record, do seem to be unnecessary.[4] Finally, some of the comments seem to stem from the squabbling between defense counsel and the prosecutor.[5] While the judge may have let his frustrations get the better of him at times (and these frustrations were not limited to the actions of defense counsel), we do not believe that his actions or demeanor crossed over the bounds of partiality.

### E.

 Defendant contends that the trial court erred by admitting, over objection, an enlarged photo of defendant's driver's license. The photo showed defendant's address, though part of it was blacked-out. The part of defendant's address which was readable showed: St. Rd. 67, Pendleton, IN 46064. The part which was blacked-out said "State Reformatory." Defendant argues that the court erred by not also blacking-out "St. Rd. 67" because most jurors would immediately associate St. Rd. 67 with the State Reformatory. The license was marginally relevant as evidence, and we do not agree that most jurors would make the alleged association. Defendant has not shown that the trial court abused its discretion by admitting the evidence, nor has he shown that the court's actions affected his substantial rights. *See* Ind.Trial Rule 61.

### F.

 Defendant challenges the trial court's ruling which required defendant to edit a video reenactment. Defendant produced a video reenactment of the scene as witnessed from cars passing by at various speeds and distances. Some scenes had defendant with a gun, and some had McElroy with a gun. The State objected to the scenes with McElroy holding a gun because no supporting evidence had been presented. The court agreed, and defendant agreed to redact these scenes from the video. Because defendant agreed to the redaction and, therefore, no objection was made, defendant has waived this issue. *See Ingram v. State*, 547 N.E.2d 823, 829 (Ind.1989). On the merits, as defendant claims his counsel was ineffective in this regard, we will only reverse a trial court's evidentiary ruling if the court abused its discretion. *See Joyner*, 678 N.E.2d at 390. We do not believe that the trial court abused its discretion. The court was within its discretion to order that the video fit the facts as they had been presented.

### G.

After defendant's conviction at the guilt phase, defendant's counsel stated that they were not ready for the penalty phase. Defendant claims that, by not continuing the penalty phase, the trial court caused defendant to receive ineffective assistance of counsel. Because we find in section IV(B) that defendant received effective assistance of counsel, we rule against defendant on this issue.

### H.

Defendant's final claim of error by the trial court concerns improper jury instructions. Defendant makes four specific challenges. Though no contemporaneous objections were

---

some of the comments were directed to the parties in general and not just to defense counsel.

4. For example, at one point the judge said to counsel, "Well, read the whole answer if you are going to—there is a way to use depositions and it should be taught, but I'm not going to teach you." (R. at 80.)

5. For example, at one point this exchange occurred:
 Prosecutor: Objection. Leading.
 Counsel: Your Honor, this is 106, completeness. This is a statement that should come in.
 Court: Objection overruled, but I think you have pursued this on direct as well as now. I don't—

Counsel: Well, in fairness it should be considered together pursuant to 106. The—
Prosecutor: Your Honor, I want to object. Every time—every time that you overstate one of our objections, she makes the implication that it's not fair.
Court: I—
Counsel: Your Honor, I must respond for the record.
Court: I'm not about to get involved in this kind of discussion with counsel on either side. Now tend to your business
Counsel: Just stating the legal reason.
Court: Now—now, Counsel, those comments are not necessary.
(R. at 4784–86.)

made at trial, defendant argues that the giving of each instruction was fundamental error.

■ First, defendant claims that the court erred by permitting the three alternate jurors to be present in the jury room during the jury's penalty phase deliberations. We have, in the past, held that it is not reversible error to permit alternate jurors to sit in on and listen to jury deliberations, so long as they are instructed not to participate. *Miller*, 623 N.E.2d at 413. In the present case, the jurors were specifically instructed by the court that "[the alternate jurors] may [be] in the jury room during your deliberations; however, the alternate jurors cannot participate in the deliberations in any matter, verbally or nonverbally, unless it becomes necessary for an alternate to replace a regular juror or by order." (R. at 5659.)

Next, defendant claims that the court committed fundamental error when it instructed the jury concerning potential penalties. During the penalty phase, the court instructed the jury that, as an alternative to the death penalty, defendant could be sentenced to between thirty and sixty years, that he could earn credit for good behavior to reduce the length of the sentence by half, and that "the court will not specifically instruct you concerning sentence modification, parole, clemency, pardons or any other provision in Indiana law which could affect a sentence." (R. at 5658.) Defendant argues that he was prejudiced because a juror might have believed that defendant could end up with a fifteen-year sentence, which could be further reduced by parole and pardon.

■ A trial court may, in its discretion, instruct the jury on sentencing alternatives when there is reason to believe that the jury will engage in speculation over the extent of alternative penalties. *See Holmes v. State*, 671 N.E.2d 841, 856 (Ind.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 137, 139 L.Ed.2d 85 (1997); *Fleenor v. State*, 622 N.E.2d 140, 145 (Ind.1993). Any such in-

struction must be complete and accurate. *Id.* As the instruction itself might lead to jury speculation, such an instruction should be used with great care. *See Holmes*, 671 N.E.2d at 861 (Selby, J., concurring). In the present case, there was some discussion during voir dire concerning alternative sentences. There was also some talk of alternative sentences during closing argument. The trial court may, therefore, have felt that it was necessary to instruct the jury on the law.[6]

■ The third of defendant's jury instruction challenges is that the instruction concerning the weighing of sentencing factors was incomprehensible and confusing. The challenged instruction stated that, "The determination of the weight to be accorded the aggravating and mitigating circumstances is a balancing process for the jury." (R. at 5654.) This particular instruction was part of a full set of instructions. In total, the court explained to the jury what mitigating circumstances were, that they could consider evidence from both the guilt and penalty phases, that to recommend the death penalty they had to unanimously find that the State proved the aggravating factor beyond a reasonable doubt and that it outweighed any mitigating factors found by any members of the jury, and that the determination of weights to be accorded to the aggravating and mitigating factors was a balancing process. The court was explaining to the jury its role under Indiana's death penalty statute, and the court did so in language that was correct and understandable. *See* Ind. Code § 35–50–2–9; *see also Fleenor*, 514 N.E.2d at 92 (noting that the weighing process is a balancing process). As a whole, the jury was sufficiently instructed as to the process by which they were to arrive at a sentencing recommendation.

■ The last of defendant's jury instruction claims concerns an instruction which told the jury to presume that every witness was telling the truth. As we have previously

---

6. For murders committed after June 30, 1993, the death sentence statute reads, "The court shall instruct the jury concerning the statutory penalties for murder and any other offenses for which the defendant was convicted, the potential for consecutive or concurrent sentencing, and the availability of good time credit and clemency." Ind.Code § 35–50–2–9(d); *see* P.L. 250–1993 §§ 2, 3 (1993).

found this instruction to be proper, *see Holmes*, 671 N.E.2d at 858; *Lottie v. State*, 273 Ind. 529, 535, 406 N.E.2d 632, 637 (1980), there was no error.

None of defendant's jury instruction challenges amount to error, much less fundamental error.

## IV.

 Defendant argues that he was denied a fair and reliable trial due to the ineffective representation of his trial counsel. He argues that his counsel was ineffective at the guilt phase, at the penalty phase, and at the sentencing hearing. In order to prove that the numerous allegations deprived him of effective assistance, defendant must prove both parts of the two-part test as set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defendant must show, first, that his counsel's actions fell below an objective standard of reasonableness, and, second, that the substandard performance was so prejudicial as to deny the defendant a fair trial. *Spranger v. State*, 650 N.E.2d 1117, 1121 (Ind.1995). To fulfill the prejudice prong, a defendant must show that he was denied a fair and reliable trial. *See Games v. State*, 684 N.E.2d 466, 469 (Ind.1997).

## A.

 Defendant claims that his counsel acted ineffectively during the guilt phase in several respects. The first alleged instance is that his counsel made confusing and prejudicial remarks during opening argument.[7] Counsel's opening argument was not constitutionally deficient as it communicated the major points of the defense: that defendant had no motive to harm the officer as Trooper Greene told him he was free to leave, that the witnesses' testimonies were varied, that the State did not do a thorough investigation, that the State carried the burden of proof, and that defendant would portray a different scenario than would the State.

 Defendant also alleges that his counsel acted deficiently by not objecting to various statements made by witnesses and to various evidence proffered by the State. In order to prove ineffective assistance due to the failure to object, a defendant must prove that an objection would have been sustained and that he was prejudiced by the failure. *See Thompson v. State*, 671 N.E.2d 1165, 1171 (Ind.1996). The alleged instances can be summarized as: 1) failure to object to the testimony of Robbins; 2) failure to object to a police officer's testimony concerning handcuffing techniques which Trooper Greene was trained to use; 3) failure to object to certain evidence[8]; and 4) failure to object to statements[9] which allegedly shifted the burden of proof to defendant. Without addressing whether any properly raised objections would have been sustained, defendant has not proven that he suffered any prejudice. For example, Robbins was thoroughly discredited as a witness. Also, and as defen-

---

7. For example, in order to highlight that the State's investigation was not as thorough as it could have been, defense counsel emphasized that the State did not run blood tests on spots of blood found on McElroy's jacket. During the trial, the State ran a blood test and found that the blood was not Trooper Greene's, thus contradicting defense counsel's blind assertion. Also, in responding to the State's argument that the shooting was the act of someone who hated authority, defense counsel stated, "Well, ladies and gentlemen, you'll also hear what Tommy McElroy's opinion of police troopers are, you'll hear what he thinks about them and I think you will be very amazed." (R. at 3021.) Defendant claims that his counsel thus admitted that he had made the derogatory statement about police.

8. The evidence in question is the following: Trooper Greene's badge as found at the scene,

the car owner's business card as found in defendant's wallet, a cigarette package with defendant's fingerprints as found in the car, and videotape footage of defendant and McElroy being arrested. Defendant argues that this was all uncontested evidence (as there is no dispute that he was in the car with McElroy) and that the admission of this evidence gave the jury an impression that the State had more evidence than it really did.

9. At one point, a State lab technician testified that all of the evidence presented during his testimony had been given to defense experts. At another point, a detective testified that the tape-recording of witness Robbins' original statement had been given to defendant. Defendant argues that, in both cases, the implication was that defendant could have, but did not, use the evidence at trial.

dant concedes in his brief, there was evidence elicited at trial to show that Trooper Greene was not precisely following his training while handcuffing McElroy, thus casting doubt on the weight to be given the handcuff training testimony. Concerning the remaining contentions, we do not believe that the statements or evidence had any probable impact on the trial, nor do we believe that their existence casts doubt on the reliability of the trial result; the evidence was at most cumulative and the statements were innocuous.

■ Defendant further contends that he received ineffective assistance during the guilt phase because his counsel failed to cross-examine McElroy, failed to do a gunshot residue test on McElroy, and failed to present the video reenactment in a manner that did not predispose the jury to believe that only defendant could have held the gun. Defendant has failed to prove that he was prejudiced on these grounds. For example, his counsel brought McElroy as a defense witness and was unrestrained in his ability to ask questions. Further, there is no evidence to suggest that a gunshot residue test would have proven anything beneficial to defendant's case. Finally, as the purpose of the video was to show the problems inherent in viewing a scene from speeding cars at different positions on the highway, we do not see how defendant was prejudiced in any way by the video.

### B.

Defendant also contends that he received ineffective assistance at the penalty phase of his trial. As the penalty phase was about to begin, defendant described what he felt were problems with the trial and the court and informed the judge that he was waiving his right to be present during the penalty phase. The judge informed defendant of his rights and insured that defendant was knowingly waiving them after conferring with his attorneys. Before leaving the court, defendant acknowledged that he had authorized his attorneys to continue in his absence. Defendant now argues that they did so ineffectively. Defendant argues that his counsel admitted to being unprepared for the penalty phase and that the record shows his counsel was unprepared to argue for his life.[10] Defendant's allegations can be pared down to four.

■ Defendant first claims that he received ineffective assistance at the penalty phase because his counsel failed to tender or object to jury instructions. Defendant has not shown,[11] nor can we find, any prejudice. Defendant next claims that he received ineffective assistance because his counsel failed to object to the State's penalty phase evidence concerning Trooper Greene. As discussed earlier, defendant might have a claim that cumulative evidence was presented, but it was all relevant to the charged aggravating circumstance and it was not prejudicial. Defendant's third claim is that counsel acted ineffectively by failing to object to portions of the State's closing argument. As we stated earlier in this opinion, there was no reversible error here.

---

10. Defense counsel's preparation for the penalty phase of the trial is not readily apparent from the record. After defendant had been convicted, the judge set the penalty phase to begin the next morning. Defense counsel stated that "we couldn't be ready tomorrow. We have witnesses that are outside the city that need to be contacted, ... doctors that we haven't had contact with and haven't been able to schedule so we'll need a little more time to prepare." (R. at 5510.) When the court asked counsel when they would be ready, defendant interrupted and stated that he wanted to end the trial right then and move on to his appeal. The court adjourned until the next morning. The next morning, after the court spent time insuring that defendant was knowingly waiving his right to be present during the penalty phase, defendant walked out and left his counsel in control. The State then asked defense counsel to state, for the record, that they had prepared for the penalty phase but were making a tactical decision not to present any mitigation evidence. Even though the State and the court each asked defense counsel to make such a statement for the record, defense counsel refused. The only response defense counsel would give was that they would not respond at this point because it was not the proper forum.

11. As part of his trial court error claim, defendant argued that the court gave three erroneous and prejudicial jury instructions during the penalty phase. *See supra* section III(H). Even assuming that these are the instructions to which defendant is referring for his ineffective assistance claim, there is no reversible error for the reasons discussed earlier.

The fourth of defendant's penalty phase claims is worth discussing in more depth. Defendant argues that he received ineffective assistance due to his counsels' penalty phase strategy. Most importantly, defendant contests his counsel's failure to argue or present mitigation evidence. At the penalty phase, defense counsel offered no evidence; however, counsel did give an opening and a closing argument. During argument, defense counsel pleaded for mercy, argued against the death penalty, and informed the jury that defendant would die in jail anyway.

As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase. *See Canaan v. State,* 683 N.E.2d 227, 234 (Ind.1997); *Wallace v. State,* 553 N.E.2d 456, 472–73 (Ind.1990); *Townsend v. State,* 533 N.E.2d 1215, 1232–34 (Ind. 1989). After an investigation into potentially mitigating evidence, a defense counsel may decide that it would be better for his client not to argue, as mitigation evidence, defendant's background history such as a history of drug abuse and a bad family life. *See Canaan,* 683 N.E.2d at 234; *Wallace,* 553 N.E.2d at 472–73; *Townsend,* 533 N.E.2d at 1234. Instead, defense counsel may determine that the better strategy would be to attack the morality and effectiveness of the death penalty itself and inform the jury that, if sentenced to a term of years, the defendant would likely spend the remainder of his life in prison. *See Canaan,* 683 N.E.2d at 234; *Townsend,* 533 N.E.2d at 1234.

In the present case, defendant does not allege that his counsel did no mitigation investigation. Instead, he alleges that he was prejudiced because his counsel chose not to present mitigation evidence. We will not second guess his counsel in this case. It is evident that his counsel did at least some investigation as counsel knew that defendant's mother would not testify, and counsel had had some psychological testing done on defendant. Given that defense counsel had an unsympathetic and apparently uncoopera-

tive defendant with a criminal history that spans three decades, they may have reasonably concluded that to argue any mitigation evidence would be ineffective and would open the door to damaging rebuttal. They may also have reasonably believed that the best penalty phase strategy was to plead for mercy, attack the death penalty itself, and argue that defendant would die in jail if sentenced to a term of years. *See Canaan,* 683 N.E.2d at 234.

### C.

Defendant claims that he received ineffective assistance of counsel at the sentencing hearing because his counsel failed to argue any mitigating evidence. However, defendant offers no examples of what counsel should have argued.[12] The trial court had the presentence investigation report and heard counsel's pleas for mercy and counsel's argument that defendant should receive a term of years because he would die in prison anyway. Defendant has shown no prejudice.

### V.

Defendant argues that he was denied a fair and impartial jury and, thus, was denied due process, a fair trial, and a reliable sentencing determination. This denial, he contends, was caused by the extensive pre-trial publicity, the actions of the trial court, and the actions of trial counsel and the State.

### A.

Defendant claims that the extensive pre-trial publicity, coupled with the actions of his counsel and the trial court, denied him a fair and impartial jury. He makes four specific arguments.

First, defendant argues that the trial court erred by denying the individual sequestered voir dire necessary to determine the impact of the extensive pre-trial publicity on each prospective juror. A trial court has broad discretionary power to regulate the form and substance of voir dire examination. *See Hadley v. State,* 496 N.E.2d 67, 72 (Ind.

---

12. In defendant's supplemental brief, *see infra* section VI, he offers a list of mitigating circumstances which are allegedly supported by the presentence investigation report. However, the court had the presentence report to examine, and defendant offers no other examples to consider.

1986). As the defendant does not have a right to have each juror separately and individually questioned, it is within the trial court's discretion whether to allow an individual sequestered voir dire. *See Holmes v. State,* 671 N.E.2d at 854; *Hadley,* 496 N.E.2d at 72–73; *Smith v. State,* 465 N.E.2d 1105, 1115 (Ind.1984). Individualized voir dire may be required, however, in a situation where circumstances are highly unusual or potentially damaging to the defendant. *Hadley,* 496 N.E.2d at 72; *Barrett v. State,* 675 N.E.2d 1112, 1118–19 (Ind.Ct.App.1996). Defendant points to no evidence of unusual circumstances that necessitate individual voir dire. Voir dire was conducted as normal. The jurors were questioned and gave answers. Jurors were chosen and excused. There is no evidence that defendant was prejudiced by the group voir dire. There was no abuse of discretion here.

■■■ Second, defendant claims that the trial court erred by not sequestering the prospective jurors as soon as each was chosen. In a capital case, the trial court must grant a defendant's motion to sequester the jury during trial. *Holmes,* 671 N.E.2d at 854; *Bellmore,* 602 N.E.2d at 117. Prior to trial, however, defendant is not entitled to have the jury sequestered, and an admonishment by the court "neither to view or listen to media coverage nor discuss the case with others" suffices until the trial begins. *Id.* In the present case, each time that a potential juror was chosen, the court gave an admonishment not to discuss the case with anyone or learn about it through the media. Then, on the same afternoon when the final jurors were selected, all of the jurors were brought together to be sequestered and to start the trial.

■■■ Third, defendant claims that he should have been granted a change of venue. In determining whether the denial of a change of venue requires the reversal of a conviction, the defendant must show that there was prejudicial pre-trial publicity and that the jurors were unable to put aside preconceived notions of guilt and render an impartial verdict. *See Bellmore,* 602 N.E.2d at 116–17; *Hopkins v. State,* 582 N.E.2d 345, 351 (Ind.1991). Defendant has not shown that his jury was unable to render a decision based purely on the evidence.

■■■ Fourth, defendant claims that he was prejudiced by the giving of a jury questionnaire prior to voir dire because the questionnaire made it obvious that the jurors were being considered for his trial and, thus, the jurors were likely influenced by the extensive pre-trial publicity. We feel that this argument is just a different try at the above arguments. Defendant was able to and did conduct voir dire, the jurors were admonished not to discuss the case or listen to the media, and defendant has not shown that he was denied a fair and impartial jury.

### B.

■■■ Defendant claims that he was prejudiced by the denial of a "for cause" challenge to a prospective juror. He argues that the denial forced him to use a peremptory strike, which, in turn, resulted in his counsel not being able to use the strike on other jurors. It is within the trial court's discretion whether to grant a for cause challenge. *Reaves v. State,* 586 N.E.2d 847, 859 (Ind. 1992); *Gibson v. State,* 515 N.E.2d 492, 495 (Ind.1987). We will reverse only when the denial prejudiced the defendant. *Id.* Here, the prospective juror stated that she would prefer to hear a defendant testify, that she might have a difficult time considering mitigation, and that she might have a bias against anyone who has committed murder. However, the juror also stated that, though she might not like the way that the law is, she would follow the law as instructed and that there might be circumstances of which she would take account in determining whether to recommend the death penalty. We do not believe that the trial court abused its discretion.[13]

### C.

■■■ Defendant claims that his counsel and the State made improper comments dur-

---

**13.** Defendant also argues that his counsel erred in failing to strike four other prospective jurors. However, each of the four jurors in question stated that he or she would make their decision on the death penalty based upon the facts of the case.

ing voir dire which improperly influenced the jury. First, he contests statements made by his counsel and the State that refer to sentence alternatives and to appellate review. Defendant has failed to show how these statements were false or prejudiced him. Defendant also contests the State's giving of a definition of "reasonable doubt" during voir dire. Again, defendant has failed to show that this statement was in error or prejudiced him. Defendant further contests his counsel's statement during voir dire that a penalty-phase decision could be based on the jury's "gut feelings." (Brief of Def. at 134.) However, counsel accurately stated that the weighing during the penalty phase is a balancing process that would be based upon each juror's view of the facts. Furthermore, the trial court fully and correctly instructed the jury on each of the above contested points.[14]

### D.

■ In his final argument concerning the jury, defendant contests the manner in which a juror was excused. One of the jurors had been accepted by both sides as a juror. The next day, however, the juror went to great lengths in order to get himself excused from the jury.[15] As a result, the juror was called back for more questioning and was eventually excused for cause. The trial court restored one peremptory strike to each side at the conclusion of the matter. Defendant contends that this contributed to his perception that he was not getting a fair trial and resulted in his not attending the penalty phase. While the occurrence was unfortunate, we think that the trial court handled it in the only manner that it could be handled.

It was quite clear at the time that retaining this juror would not be in the best interests of a fair and impartial trial, and his excusal for cause was the right decision.

### VI.

At the sentencing hearing, the trial court verbally imposed a death sentence.[16] Following the filing of this appeal, this Court ordered [17] that the trial court prepare a written sentencing order and that defendant file the order in a supplemental record.[18] We also granted defendant leave to file a supplemental brief addressing the sentencing order only. Defendant raises four issues relative to the sentencing order. As did the State, we will address them *seriatim*.

### A.

Defendant first argues that the Indiana death penalty statute is unconstitutionally vague concerning non-statutory mitigators and that he was prejudiced by this flaw. Defendant claims that Ind.Code § 35–50–2–9(c)(8) (which allows the judge and jury to consider as mitigating "any other circumstances appropriate for consideration") does not provide the jury and judge enough guidance with regard to non-statutory mitigating factors. He further claims that the failure of the trial court to consider numerous non-statutory mitigating factors in the present case is evidence that the statute provides insufficient guidance.

■ Defendant likens his situation to that of the defendants in *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) and *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987).

---

**14.** Defendant also believes that it is error to inform the jury that their role is one of recommendation only. We have held before that this is an accurate statement of the law and is not error. *See Lowery v. State*, 640 N.E.2d 1031, 1043–44 (Ind.1994).

**15.** For example, an appellate judge called the trial court concerning the matter.

**16.** The court stated that, after considering the jury's recommendation, it found that the State proved the aggravating circumstance beyond a reasonable doubt and that "any mitigating circumstances that exist are clearly outweighed by

the aggravating circumstances proven beyond a reasonable doubt and therefore the Court imposes a sentence of death." (R. at 5693.)

**17.** *See* Order dated May 9, 1996.

**18.** The written sentencing order was prepared and filed as ordered. In the order, the trial court notes that it finds that the State proved the aggravating factor beyond a reasonable doubt, that none of the mitigating circumstances of Ind. Code § 35–50–2–9(c) apply, that no other mitigating circumstances exist, and that death is the appropriate penalty.

However, the situations in those two cases are entirely different. In *Hitchcock*, the judge instructed the jury that they may only consider as mitigating those factors which were listed in the statute, even though defendant had argued non-statutory mitigation. *Hitchcock*, 481 U.S. at 398, 107 S.Ct. at 1824. The trial court also noted that the only mitigating factors he would consider were those statutorily enumerated. *Id.* The Supreme Court held that this was error. *Id.* at 399, 107 S.Ct. at 1824. In *Sumner*, the defendant was sentenced to death under a statute which made the death penalty mandatory in certain situations. *Sumner*, 483 U.S. at 67, 107 S.Ct. at 2717–18. The Supreme Court held that the mandatory death penalty statute at issue departed from the "individualized capital-sentencing doctrine" and was unconstitutional. *Id.* at 78, 107 S.Ct. at 2723. In so holding, the Court noted that "the Eighth Amendment requires that the defendant be able to present any relevant mitigating evidence that could justify a lesser sentence." *Id.* at 85, 107 S.Ct. at 2727. In the present case, the death penalty was not mandatory and the trial court did not limit the jury or itself to statutory mitigating factors.

Furthermore, Indiana's death penalty statute protects against arbitrary and capricious sentencing by allowing the trial court to consider the individual offender and offense and, thus, meets the requirements of the United States Constitution. *See Van Cleave v. State*, 517 N.E.2d 356, 373 (Ind.1987); *Moore v. State*, 479 N.E.2d 1264, 1277 (Ind.1985); *Resnover v. State*, 460 N.E.2d 922, 928 (Ind. 1984). The death penalty statute specifically enumerates mitigating circumstances and provides the means by which a defendant may argue, and a court may consider, any other mitigating circumstances that are particular to that defendant. *See* Ind.Code § 35–50–2–9(c). Thus, there is no merit to

defendant's contention that the death penalty statute is unconstitutionally vague.

■ Defendant's actual argument is that the court failed to consider appropriate mitigating circumstances. Although a defendant may argue any number of factors as mitigating, this does not mean that the trial court must give mitigating weight to every factor alleged by the defendant "simply because it is supported by some evidence in the record." *Bivins v. State*, 642 N.E.2d 928, 952 (Ind.1994), *cert. denied*, 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996). Furthermore, the trial court is not obligated to address every mitigating factor asserted by the defendant and explain why the court did not find it be mitigating. *Id.* "This is particularly true when an examination of the underlying record shows the highly disputable nature of the mitigating factors." *Id.* (citing *Hammons v. State*, 493 N.E.2d 1250, 1254 (Ind.1986)). However, a failure by the trial court to find mitigating circumstances which are clearly evident from the record may lead this Court to believe that they were overlooked and not properly considered. *Id.*

■ Defendant lists a full page of facts from the presentence investigation report which he believes should have been considered as mitigating factors. These can be simplified to several general contentions: 1) that defendant was brought up in a dysfunctional family, 2) that defendant has a history of alcohol abuse, 3) that defendant has a family of his own, 4) that defendant did well in the structured environment of prison, and 5) that defendant would likely die in prison were he to receive the maximum prison term of sixty years. In the present case, none of these alleged mitigating factors are so clearly and indisputably mitigating that we can say the trial court erred in its evaluation.[19] *See Saylor v. State*, 686 N.E.2d 80, 85–86 (Ind. 1997); *Lowery v. State*, 547 N.E.2d 1046,

---

**19.** Defendant cites to *Baird v. State*, 604 N.E.2d 1170, 1182 (Ind.1992); *Evans v. State*, 598 N.E.2d 516, 518 (Ind.1992); and *Johnson v. State*, 584 N.E.2d 1092, 1101 (Ind.1992) to support his argument that we have previously found the existence of mitigating circumstances where the trial court did not. This proposition is not the same, however, as the outcome which defendant seeks—a reversal of his sentence. In two of

the three cases cited, the death penalty was affirmed despite our finding of mitigating factors which the trial court did not. *Baird*, 604 N.E.2d at 1182; *Johnson*, 584 N.E.2d at 1108. In *Evans*, we reversed the death sentence after finding that the mitigating circumstances (which were significantly greater than those alleged here) outweighed the aggravating circumstance. *Evans*, 598 N.E.2d at 518–19.

1059 (Ind.1989); *Fleenor v. State,* 514 N.E.2d 80, 89 (Ind.1987).

### B.

Defendant next argues that the trial court used an incorrect standard in making its sentencing decision. At the sentencing hearing, the State cited to *Martinez Chavez v. State,* 534 N.E.2d 731 (Ind.1989) and argued that the trial court could not override the jury's recommendation of death absent clear and convincing evidence that no reasonable person could disagree with the jury's result. Defendant believes that the trial court incorrectly applied this standard and gave total deference to the jury's recommendation.

As defendant rightly notes, our holding in *Martinez Chavez* concerned a situation where the trial court overrode a jury's recommendation *against* death, *Martinez Chavez,* 534 N.E.2d at 735, and, thus, the standard announced in that case would not apply to defendant's case. Defendant, however, provides no evidence that the trial court did as he suggests and gave total deference to the jury's recommendation. At the sentencing hearing and in the sentencing order the court stated that, independent of the jury's recommendation, the court found death to be the appropriate penalty.

### C.

Defendant's third issue relevant to the sentencing order is that the evidence was insufficient to support the aggravating circumstance. In seeking the death penalty, the State relied upon the aggravating circumstance that the "victim of the murder was a ... law enforcement officer, and ... (A) the victim was acting in the course of duty." Ind.Code § 35–50–2–9(b)(6) (1993); (R. at 5549–50.). Defendant concedes that the State proved beyond a reasonable doubt that the victim was a law enforcement officer acting in the course of duty. Defendant argues, however, that there was insufficient evidence that defendant was the murderer.

This argument has no merit. Defendant had already been found guilty, beyond a reasonable doubt, of the murder of Trooper Greene. We previously determined that there was sufficient evidence to support the conviction. The issue at the penalty phase was whether the aggravating circumstance could be proven beyond a reasonable doubt. As defendant concedes, it was.

### D.

Defendant's final argument concerning the sentencing order is that the death penalty statute is unconstitutional because its qualifying language precludes consideration of relevant mitigating evidence. He offers as an example that the statute limits consideration of a mental or emotional disturbance to instances when it is "extreme." Ind.Code § 35–50–2–9(c)(2) (1993). We will not go into this issue in depth because we have previously ruled that there is no merit to this claim as, under Ind.Code § 35–50–2–9(c)(8), a jury and judge may consider as mitigating any circumstances that they believe are appropriate. *See Bivins,* 642 N.E.2d at 947.

### VII.

Defendant argues that the death penalty is not the appropriate sentence. Defendant claims that, due to the numerous errors and inadequacies in his trial, there was not enough information for the court to make a reliable sentencing decision and there is not enough information for appellate review. Specifically, defendant contests the adequacy of the presentence investigation report, and he argues that death is not appropriate in this case.

### A.

Defendant claims that the presentence investigation report which was prepared in his case, and objected to by defendant, contained prejudicial and irrelevant information which denied him a fair and reliable sentencing determination. As evidence of prejudicial information, defendant alleges that the presentence investigation report contains victim impact evidence, evidence of non-statutory aggravating circumstances, the personal opinion of the probation officer, and the conclusion that there are no mitigating circumstances.

Defendant is correct that the inclusion of victim impact statements was in

violation of Ind.Code § 35–38–1–9 as in effect at the time of his crime. Ind.Code § 35–38–1–9(b)(3), (c)(4) (1993).[20] Defendant is also correct that, in a death penalty case, it is error to admit evidence concerning non-statutory aggravating factors. *See Bivins,* 642 N.E.2d at 956–57. However, the evidence in question was not admitted to the jury; only the judge saw the presentence investigation report as it was prepared after the jury had already given its recommendation. The situation in this case is like that in *Hough v. State,* 560 N.E.2d 511, 515 (Ind.1990), where some victim impact evidence was contained in the presentence investigation report and some members of the victim's family were introduced to the judge. In that case, we held that no reversible error existed because none of the evidence was presented to the jury and there was no indication that the court relied in any way on the questioned evidence. *Id.* As in *Hough,* none of the evidence in question was presented to the jury. Further, the court explicitly noted that it would not consider the victim impact statements and that it would only consider the statutorily permitted aggravating circumstances. As to the report's notation that there was no mitigation evidence, the presentence report is only to provide information to the court, which it did; the court does its own evaluation of the evidence to determine the existence of mitigating factors. *See Schiro v. State,* 451 N.E.2d 1047, 1063 (Ind.1983). There is no evidence to suggest that the court relied upon the report's conclusion. The evidence, instead, suggests that the court evaluated the evidence in its entirety and made an independent determination.

### B.

Defendant contends that death is not the appropriate penalty in this case. He argues that proportionality review supports the fact that the death penalty is inappropriate. Specifically, he notes that the death penalty is inappropriate when compared to the instant offender and offense and when compared to similar cases.

▬▬ As part of his argument, defendant proposes a framework for "comparative-pro-portionality review." He does so because he believes that this Court does not have a consistent pattern on how to compare one death penalty case to another to determine whether the death penalty is appropriate. As this Court has held many times in the past, however, neither the Indiana nor the United States Constitution requires a comparative-proportionality review. *See Gambill v. State,* 675 N.E.2d 668, 677–78 (Ind. 1997); *Willoughby v. State,* 660 N.E.2d 570, 584 (Ind.1996); *Baird v. State,* 604 N.E.2d 1170, 1183 (Ind.1992); *Burris v. State,* 465 N.E.2d 171, 192 (Ind.1984). Each death penalty case receives individualized appellate scrutiny to ensure that the death penalty is appropriate. *See Judy v. State,* 275 Ind. 145, 416 N.E.2d 95, 108 (1981).

▬▬ Having previously found that the trial court committed no error in sentencing defendant, we now turn to our independent review to determine whether the death penalty is appropriate.

In the present case, the State charged, as aggravating, that the victim of the murder was a law enforcement officer who was murdered while acting in the course of duty. As did the jury and trial court, we find that the State proved the aggravating factor beyond a reasonable doubt. In its written sentencing order, the trial court found that none of the statutory mitigating circumstances existed and that there were no non-statutory mitigating circumstances. As discussed in section VI(A) above, defendant contends that the trial court erred by not considering the evidence contained in the presentence investigation report which points to mitigating evidence. Defendant does not argue, nor do we find, that the trial court neglected any statutory mitigating factors. Instead, defendant refers to the following list of non-statutory mitigating factors from the presentence investigation report: 1) that defendant's father was an alcoholic and he was brought up in a dysfunctional family, 2) that defendant has a history of alcohol abuse, 3) that defendant has a family that will be affected by his death, 4) that defendant has done well in the structured environment of prison, and 5) that

---

**20.** This section was amended effective July 1, 1996. *See* P.L. 216–1996 § 13 (1996).

defendant would likely die in prison if given a sixty year sentence. We find that there is some evidence in the record to support these mitigating factors and we find that the trial court recognized them as not being significant. Thus, we determine that the death penalty is appropriate for this offender and this offense.

## CONCLUSION

Defendant's conviction and sentence are affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.