# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 29 2017, 6:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erik H. Carter
Carter Legal Services LLC
Noblesville, Indiana

ATTORNEY FOR APPELLEE

Andrea L. Ciobanu
Ciobanu Law, P.C.
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Paul B. Deignan, Jr., *Appellant-Petitioner,* <br><br> v. <br><br> Shawn E. Deignan, *Appellee-Respondent* | September 29, 2017 <br><br> Court of Appeals Case No. 79A04-1611-DR-2504 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Sean M. Persin, Judge <br><br> Trial Court Cause No. 79D05-1010-DR-6 |

**Crone, Judge.**

## Case Summary

[1] Following an evidentiary hearing at which he appeared telephonically, Paul Deignan ("Father") appeals the trial court's order modifying his child support obligation to his ex-wife, Shawn Deignan ("Mother"). Father makes two arguments: (1) the trial court's adjournment of the hearing was improper; and (2) the trial court erred in denying him a parenting time credit against his child support obligation. We conclude as follows: (1) the trial court acted within its discretion in adjourning the hearing based on Father's disruptive behavior; and (2) the trial court did not enter sufficient findings to justify its denial of Father's parenting time credit. Accordingly, we affirm in part and remand for further proceedings.

## Facts and Procedural History

[2] Father and Mother were divorced in 2007, after Father permanently moved to Texas. The parties had three children while married, born in 1988, 1996, and 2000. Mother continued to live in Indiana and was awarded custody of the children, and Father was granted a total of eight weeks of parenting time per year. Father subsequently remarried in Texas. Father's original child support obligation was $430 per week, which was lowered to $301 per week in 2010 when the oldest child was emancipated. Also in 2010, the trial court ordered Father to pay $1835.07 to Mother for medical bills that Mother had paid.

[3] Subsequently, Father lost a job that paid $115,000 per year and then found employment that paid $34,000 per year. The trial court refused to lower

Father's support amount, finding that he was voluntarily underemployed. On appeal, we reversed that ruling and remanded with instructions to modify Father's support obligation based on his actual yearly income of $34,000. *Deignan v. Deignan*, No. 79A02-1407-DR-515, 2015 WL 2183852 (Ind. Ct. App. May 11, 2015).

[4]     In May 2015, the trial court held a hearing with the parties and then issued an order identifying three issues that needed to be resolved in light of our decision: (1) the amount of Father's support obligation, based on his annual income of $34,000 as well as other factors such as overnights and subsequently-born children; (2) whether a modification of Father's support obligation should be retroactive; and (3) whether Father owed an arrearage or had instead overpaid child support.[1]   In July 2015, the trial court modified Father's support obligation to $139 per week.

[5]     In February 2016, Mother filed a motion to modify Father's support obligation after learning that he had a new job that paid approximately $75,000 per year. In May 2016, Mother filed a petition to hold Father in contempt for not having paid the $1835.07 in medical bills pursuant to the 2010 order, and further alleging that Father was in arrears on child support. Mother also filed a motion to compel discovery from Father. In July 2016, the trial court held a hearing to

---

[1] We note that the trial court took action in reliance on our memorandum decision before it was certified as final. We remind the parties and the trial court that no action should be taken in reliance on a decision of this Court until that decision has been certified as final by the clerk of this Court. *See* Ind. Appellate Rule 65(E).

discuss pending matters; Father appeared by telephone. Both parties were proceeding pro se. During this hearing, the trial court attempted to clarify precisely what matters were pending. Mother reiterated her requests for a support modification, a contempt order, and an order to compel discovery. She also requested that the parties' middle child be emancipated because she had turned nineteen and asked for Father to contribute to that child's college expenses. The trial court stated that Mother needed to file a petition related to college expenses if she wanted to pursue that issue. Father expressed his desire to have custody of the parties' youngest child and also stated that he was not exercising any parenting time due to "interference from the wife." Tr. at 22. The trial court advised Father that he would need "to file some motions with regard to custody." *Id.* The trial court also stated, "If you want to file any motions you gotta file them as well. I don't want you to come into Court and make some arguments that she doesn't have a chance to respond to; she's not ready." *Id.* at 21. The trial court further clarified, "[S]ir, you've got an issue with parenting time but you didn't file anything with the Court. Don't expect me to hear evidence or to offer evidence and have me listen to parenting time.… If I receive nothing else." *Id.* at 27. At the conclusion of the hearing, the trial court scheduled a hearing for September 2016 to address all outstanding matters.

[6] Mother never filed a petition related to college expenses and did not further pursue the issue. Father never filed any motions related to custody or parenting time. Instead, in August 2016, he sent an email to the trial court alleging that

Mother had alienated the children from him and asking the court to "hold these proceedings in abeyance until such time as the custodial parent insures that there is satisfactory communication between me and my children ….. If necessary, I would welcome the appointment of a mediator and/or child psychologist familiar with alienation …." Appellant's App. Vol. 2 at 57. Two days later, Father filed a petition for referral to mediation. The trial court granted this request and vacated the September 2016 hearing. However, in September 2016, the appointed mediator reported to the trial court that Father "declined to finish intake, and has indicated that he does not wish to use this program for mediation." *Id.* at 62. The trial court then scheduled a hearing for October 21, 2016.

[7] Again, Father appeared by telephone (audio only) at this hearing and was acting pro se; Mother appeared in person and also was acting pro se. Mother had previously provided intended exhibits for the hearing to the trial court and Father, as the trial court had ordered the parties to do, but Father had not done so. At the outset of the hearing the trial court asked Mother to state her name. When she said "Shawn Deignan," an unidentified voice on Father's phone line said "No." Tr. at 31. The trial court asked Father, "Who else responded to that? Because I heard a voice that wasn't yours." *Id.* at 32. Father said, "Um, no one here." *Id.* The trial court asked again, "There's nobody else with you?" and Father denied that there was. *Id.* The trial court reiterated, "I was pretty sure I heard a voice[,]" before continuing with the hearing. *Id.*

[8]     The trial court then allowed the parties to make opening statements. During Father's opening statement, he alleged that Mother was prohibiting the children from speaking with him or had convinced the children not to do so. The trial court then stated:

> We told you at the scheduling conference both of you; you file a proper motion or I don't want to address it. I'm gonna follow the trial rules. So with regard to request to modify parenting time, communications, or any other orders in that regard I'm not gonna hear it today. Doesn't mean it's not important. It doesn't mean I don't care but if you don't file a motion to put everybody on notice of what we're going to address then I'm not gonna hear it. Sir, I don't recall getting any motions from you other than your request for mediation. Am I correct?
>
> [Father]: As I understand it Judge, the way the system is supposed to work is I'm supposed to be able to call the kids. What I'm saying to you is that your system that you have set up; it's totally broken and it is what - (inaudible) – is not working. I'm not asking for anything to - (inaudible) –
>
> [Trial Court]: Anything else you want to say in your opening statement?
>
> [Father]: No, —(inaudible)—broke our system but it's gone.

*Id.* at 41.

[9]     The trial court then received testimony from Mother regarding the unpaid medical bills. The trial court then swore in Father to testify. After Father began discussing medical bills, the following colloquy ensued:

[Trial court]: …. I'm just asking do you have anything you want to say as to why it has not been paid; that's it.

[Father]: No, no, it's been totally paid. It's been paid three times over.

[Trial court]: The amount—I'm talking about the amount that was ordered for you to pay Ms. Deignan and ordered by Judge Busch; has that amount been paid?

[Father]: I'm sorry, am I not being clear here?

[Trial court]: No, you're not.

[Father]: It's been paid three times over. She's always been given—not only were the bills paid, the nine thousand dollars, but she was given in her pocket three thousand dollars. It's in your records.

[Trial court]: When was that paid, sir?

[Father]: I—am I allowed to talk? It's—look, it's in your child support. When you do the recalculation of child support you only started from a point where I had no job. Before that there was a three thousand dollar surplus account I always maintained. So there was never any—and we're talking about something seven years back; this is the most—(inaudible)—thing I've ever heard. It's really torturous. She got three thousand dollars given to her thanks to you by eradicating this surplus.

[Trial court]: You're coming close to being found in contempt. I understand you're in the state of Texas and I'm trying to be patient. Because first—

[Father]:  (inaudible)

[Trial court]:  —hold on now I'm talking.  Stop now.  You said that the order with regard to communications—

[Father]:  —(inaudible)—I can't even hear you.

[Trial court]:  You know; I want you to listen now.

[Father]:  Listen to what?

[Trial court]:  I'm talking.  I tried hard, very hard to treat parties with respect; to listen when they're talking but I expect the same from you.  If you can't do that you will be found in contempt.  You're talking while I'm talking.  If you can't do that we will be done.

[Father]:  I'm taking you off the speaker so this doesn't— (inaudible)—

[Trial court]:  My order granting your ability to appear telephonically is conditioned on your willingness to treat everybody including the Court and the parties with respect.  If you don't do that we will be done today.

[Father]:  Do you feel that I'm not treating you with respect because I don't understand how you see that?

[Trial court]: You can knock off the sarcasm; it's not well received.

*Id.* at 46-48.

At this point, the trial court attempted to redirect Father toward the issue of the allegedly unpaid medical bills. Father then spoke for several minutes about a variety of matters, accusing Mother of neglecting their middle child's health and of forcing their youngest child, a boy, to take medication that caused him to grow breasts. He also accused an earlier trial judge of having an "animus" against him and erasing court records related to an alleged child support surplus. *Id.* at 51. Father also called the current proceedings "factitious [sic], torturous, and unbelievable," and stated that they concerned "trivialities and stupidities." *Id.* at 49-50. When Father said that he could provide a .pdf file demonstrating the alleged child support surplus, the following discussion took place:

> [Trial court]: That was to be done already. And you know that. So what—(inaudible)—again—
>
> [Father]: I don't know anything.
>
> [Trial court]: So you don't plan to pay the eighteen hundred is what I hear.
>
> [Father]: I'm sorry sir?
>
> [Trial court]: You do not plan to pay the eighteen hundred dollars, is that what I hear?
>
> [Father]: No, I've already paid it.
>
> [Trial court]: All right.

[Father]: I've already paid it.

[Trial court]: So let's move on to your next issue. I'm not hearing any additional evidence on that. Let's talk about the issue—

[Father]: Can you hear me at all?

[Trial court]: Oh, I can hear you clearly.

[Father]: That's been paid.

*Id.* at 51-52.

[11] The trial court then turned to the issue of child support. Mother testified that Father had last exercised an overnight visit with any of the children in June 2012. Father objected to this testimony, but the trial court overruled his objection. After discussion about the parties' income and health insurance, Father brought up the matter of visitation, saying "this is a big issue." *Id.* at 61. The trial court responded, "It's not set. You can address the issue of overnights as it applies to child support." *Id.* Father then testified at length about alleged interference with his visitation by Mother and her having alienated the children against him.

[12] After several minutes, the trial court interrupted Father, saying:

All right, I'm gonna cut you off for a second, sir. And again, I've listened to what you had to say on that now, I've asked you to contain the evidence to the issues before the Court. I had told

> you before if you want to file a motion as to parenting, file a
> motion or notice to the other side and I'll address it. You think
> she's in contempt, file your petition to cite contempt. I'll set it for
> a hearing and when –

*Id.* at 62. Father then interrupted the trial court, who advised Father to stop interrupting and to listen, and the trial court continued discussing the need for Father to file a separate petition to address parenting time. Father interrupted the trial court yet again, who told Father to "stop cutting me off. It's one thing if you can't hear me and you're saying Judge I can't hear what you're saying. It's another to try to argue over me." *Id.* at 63. The trial court again admonished Father that the only issues properly before the court were child support and the unpaid medical bills and that the parenting time issue could be addressed only if Father had filed a motion to modify it or to hold Mother in contempt for not allowing it. The court remarked, "I'm losing my patience slowly with you, sir." *Id.*

[13] The trial court then permitted Father to cross-examine Mother. Father immediately began questioning Mother about the parenting time credit and whether she wanted to "nullify" it. *Id.* at 64. The trial court interrupted and said, "I'm not going to hear evidence on the issue of parenting time at this time. You did not file a motion; we're not going to address it. Sir, next question." *Id.* Father responded, "I'm not doing that," and proceeded to continue asking Mother about the parenting time credit. *Id.* The trial court repeatedly told Father to ask a different question, but he insisted on continuing to ask about and discuss parenting time.

[14] After several minutes of this back-and-forth between the trial court and Father, an unknown voice was heard on his phone line saying, "Paul—(inaudible)—." *Id.* at 66. The trial court asked who that was, and Father said that it was his current wife. The following discussion ensued:

> [Trial court]: When I asked you who else was with you you said nobody. We could hear the voice the entire time. Now I don't appreciate being lied to, sir. Next question for this witness.

> [Father]: Pardon me sir. Don't accuse me of lying to you. I think you misinterpret whatever I've said. There's nobody else talking is what I told you. (inaudible)

> [Trial court]: Next question for this witness.

> [Father]: You asked me who was here. I will tell you very directly; my wife is here. But she didn't speak; she didn't say anything before. But if you want to accuse me of being a liar I basically think we don't have a relationship to talk about. And I would ask for another Judge. I don't think you have been honest in this matter and I don't think you're fit and proper to decide this matter and quite frankly I've - (inaudible) – at your decision.

> [Trial court]: In which case you need to file a motion for change of Judge and then I will decide whether or not it should be granted or not. Keep in mind there are rules as to when you can make that request.

> [Father]: You accused me of being a liar.

[Trial court]: I asked you on the record whose voice did I hear
and anybody else was with you and you said there was no one
else there.

[Father]: That's not what I said.

[Trial court]: Well you can listen to the transcript on that. Do
you have any other questions for this witness?

[Father]: —(inaudible)—time.

[Trial court]: All right we're done for today. The Court's gonna
deny the request to continue to do this.

[Father]: —(inaudible)—

[Trial court]: The Court's gonna note as we're recording this that
the respondent is talking at the same time as the Judge; is
refusing all instructions of the Court; is found in contempt of
Court. We're disconnecting the call at this time. It's under
advisement.

*Id.* at 66-68. The trial court then denied Mother's request to present an

additional piece of evidence and ended the hearing.

[15]  On October 24, 2016, the trial court entered an order stating that the hearing

"ended abruptly due to Father's disruptive behavior" and finding Father in

direct contempt "for violating several instructions of the Court, rude and

disrespectful conduct towards the Court, and intentional disruption." Appealed

Order at 2, 1. The order also admonished Father for failing to inform the trial

court that his current wife was present with him during the hearing, noting that it gave him an unfair advantage over Mother because, as a pro se party, she was not allowed to have a non-lawyer present to assist her during the hearing. The trial court declined to enter a sanction against Father for his contemptuous conduct, but it did state that he would have to appear personally for any future evidentiary hearings involving him and Mother. The trial court did not hold Father in contempt for failing to pay the outstanding medical bills but did order him to pay them within thirty days. As for child support, the trial court emancipated the middle child and ordered Father to pay $196 in support for the youngest child. The trial court did not award any parenting time credit to Father, finding without elaboration that he was "not exercising any parenting time at this time." *Id.* at 3. Father now appeals.

## Discussion and Decision

### Section 1 – The trial court acted within its discretion in adjourning the hearing due to Father's disruptive behavior.

[16]   Father does not challenge the trial court's contempt finding, but he does contend that the court improperly adjourned the hearing.[2] If the trial court had adjourned the hearing solely because Father's wife was in the room with him,

---

[2] Father spends one page of his two-page argument discussing the constitutional right to trial by jury, which is inapplicable and irrelevant here.

this would have been improper.[3] Father's wife (and any other member of the general public) would have been entitled to attend the hearing in person, as long as they did not disrupt the proceeding. *See* Ind. Trial Rule 43(A) ("In all trials the testimony of witnesses shall be taken in open court, unless state law, these rules, the Indiana Rules of Evidence, or other rules adopted by the Indiana Supreme Court provide otherwise."); *Bobrow v. Bobrow*, 810 N.E.2d 726, 729 (Ind. Ct. App. 2004) (mentioning final dissolution hearing that was "open to the public"); *Lynch v. Bates*, 139 Ind. 206, 208, 38 N.E. 806, 807 (1894) (acknowledging "the right of the people to attend trials in court," provided that "such attendance is orderly and respectful of the dignity and procedure of the court"); Ind. Code § 34-47-2-1(a) (providing that person who disturbs court proceedings "by creating any noise or confusion … is considered guilty of a direct contempt of court."). We see no reason why a different rule should apply to a (partly) telephonic hearing.[4]

[17] The order specifically states that the trial court adjourned the hearing based on Father's "disruptive behavior," and we believe that the court acted well within its discretion in doing so. "Trial courts are vested with inherent authority to control their own proceedings[,]" and we will reverse a trial court's decision regarding the conduct of proceedings only for an abuse of discretion. *Parker v.*

---

[3] Contrary to Father's suggestion, the record supports the trial court's finding that Father lied to the court at the beginning of the hearing when asked, more than once, whether someone else was present with him, after the trial court heard another voice on the line.

[4] The trial court did not make a finding that Father's wife disrupted the hearing, and we express no opinion on the matter.

*State*, 567 N.E.2d 105, 110 (Ind. Ct. App. 1991), *trans. denied*; *see also Timberlake v. State*, 690 N.E.2d 243, 256 (Ind. 1997) ("[A] trial judge must be given latitude to run the courtroom and maintain discipline and control of the trial."), *cert. denied* (1999). The hearing transcript amply supports the trial court's finding that "Father refused to limit his evidence or questions to matters before the Court, and instead attempted to re-litigate matters previously heard by the Court while repeatedly impugning the dignity of the Court." Appealed Order at 1. Father was warned multiple times that the trial court was losing patience with his interruptions and defiance and sarcasm, yet he persisted in his disruptive behavior. We conclude that the trial court did not abuse its discretion in adjourning the hearing when it did.

## Section 2 – The trial court's findings are insufficient to justify denying Father a parenting time credit against his child support obligation.

[18] We now address Father's argument that the trial court erred in denying him a parenting time credit against his child support obligation. Indiana Child Support Guideline 6 states, "A credit should be awarded for the number of overnights each year that the child(ren) spend with the noncustodial parent." Even if a noncustodial parent is exercising overnight parenting time, whether to award this credit rests within a trial court's discretion. *Bogner v. Bogner*, 29 N.E.3d 733, 743 (Ind. 2015). In fact, all decisions regarding child support fall within the sound discretion of the trial court. *Quinn v. Threlkel*, 858 N.E.2d 665, 670 (Ind. Ct. App. 2006). However, that discretion "'must be exercised within

the methodological framework established by the [Child Support] guidelines.'" *Id.* (quoting *McGinley-Ellis v. Ellis*, 638 N.E.2d 1249, 1251-52 (Ind. 1994)). Child support awards comporting with the Guidelines are presumptively correct; deviations from a support award complying with the Guidelines must be supported by written findings justifying the deviation. *Id.*

[19] The official commentary to Guideline 6 explains in part:

> **Application of Parenting Time Credit.** Parenting Time Credit is not automatic. The court should determine if application of the credit will jeopardize a parent's ability to support the child(ren). If such is the case, the court should consider a *deviation* from the credit.
>
> The Parenting Time Credit is earned by performing parental obligations as scheduled and is an advancement of weekly credit. *The granting of the credit is based on the expectation the parties will comply with a parenting time order.*
>
> A parent who does not carry out the parenting time obligation may be subject to a reduction or loss of the credit, financial restitution, or any other appropriate remedy. However, *missed parenting time because of occasional illness, transportation problems or other unforeseen events should not constitute grounds for a reduction or loss of the credit*, or financial restitution.
>
> …..
>
> **Contents of Agreements/Decrees.**
>
> ….

> *If the court determines it is necessary to deviate from the parenting time credit, it shall state its reasons in the order*.

Ind. Child Support Guideline 6, cmt. (emphases added).

[20] In light of the commentary language, it is clear that, although trial courts are not required to award parenting time credit to a parent who exercises overnight visitation, there is a presumption that it should be awarded, in the absence of written findings explaining why it should not be. *See Bogner*, 29 N.E.3d at 744 ("These findings were sufficient to support the trial court's conclusion that awarding the parenting time credit was not appropriate."). Not awarding the credit is considered a "deviation" from the Guidelines that must be supported by written findings. The commentary also recognizes that a variety of factors can lead to a parent not exercising all of the parenting time to which he or she was entitled or awarded. If such factors, including "unforeseen" factors, were not the fault of the noncustodial parent, the parenting time credit should not be reduced. Ind. Child Support Guideline 6, cmt. This is consistent with the general public policy of not wanting to encourage custodial parents to withhold parenting time from noncustodial parents for child support reasons. *Bogner*, 29 N.E.3d at 744. It logically follows that if a custodial parent wants to eliminate the parenting time credit because the noncustodial parent is not exercising parenting time, the trial court should enter findings explaining why the noncustodial parent is not doing so, or alternatively why elimination of the parenting time credit would be appropriate no matter the initial reason the

noncustodial parent stopped exercising visitation. A blanket finding that the noncustodial parent is not exercising parenting time is insufficient.

[21] Here, Father was awarded eight weeks of overnight parenting time annually in the dissolution decree. This would amount to fifty-six overnight visits and would normally entitle Father to a seven-percent parenting time credit. *See* Ind. Child Support Guideline 6, Table PT. At the hearing in this matter, Mother testified that Father had not exercised any parenting time since June 2012, but gave no explanation as to why he had not done so. As noted, Father claimed he had not voluntarily given up parenting time but was forced to do so by Mother's interference. The trial court found that Father was not currently exercising any parenting time, which Father does not dispute. However, this sparse finding was insufficient to justify eliminating the parenting time credit when calculating his child support obligation in light of Father's claims of parenting time interference.

[22] We remand for the trial court to further consider the issue of the parenting time credit and to either issue more detailed findings justifying the withholding of the credit from Father or to reinstate that credit and recalculate his support obligation accordingly. *See Grant v. Hager*, 868 N.E.2d 801, 804 (Ind. 2007) (remanding for reconsideration of deviation from Child Support Guidelines where trial court did not make necessary findings to support deviation). The trial court has discretion as to how to proceed on remand. *See Grant v. Hager*, 879 N.E.2d 628, 631 (Ind. Ct. App. 2008) (holding that, in the absence of explicit instructions from an appellate court, a trial court need not hold a new

hearing on remand). *See also* Ind. Appellate Rule 66(D) (stating that trial court error may "be corrected without a new trial or hearing unless this relief is impracticable or unfair to any of the parties or is otherwise improper"). If the trial court does elect to hold a new hearing regarding the parenting time credit, it may adhere to its earlier ruling that Father must appear in person for such a hearing, in light of his disruptive behavior at the last hearing.

[23] Affirmed in part and remanded.

Baker, J., concurs.

Barnes, J., concurs in result with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Paul B. Deignan, Jr., *Appellant-Petitioner,* v. Shawn E. Deignan, *Appellee-Respondent.* | Court of Appeals Case No. 79A04-1611-DR-2504 |

**Barnes, Judge.**

[24]   I write to concur in result and to address the trial court's overall handling of the matter.  The adage "no good deed goes unpunished" comes to mind.  Although the majority does not discuss whether Mr. Deignan was properly found to be in contempt, that was the basis for the trial court's termination of the hearing, and I would analyze it as such.

[25]   The trial court, in an effort to facilitate this hearing by conducting it by telephone, was faced with a recalcitrant and, in my opinion, disrespectful and contumacious litigant, Mr. Deignan.  I am convinced that the judge reached the end of his patience rope, not because the current Mrs. Deignan was present

with her husband, but because, in addition to numerous other rude, disrespectful, and ultimately contempt-worthy matters, Mr. Deignan lied to the judge about that fact. Everyone has a right to be present at a hearing, as the majority indicates. One cannot lie to a court, though, as Mr. Deignan did here. Additionally, the trial court's main concern about Mrs. Deignan was whether she was secretly assisting Mr. Deignan with the hearing, while Mother had no such assistance. I believe it would have been within the trial court's discretion to prohibit the parties from having any kind of lay assistance. *Cf. Owen v. State*, 269 Ind. 513, 518, 381 N.E.2d 1235, 1238 (1978) (noting pro se defendants have no right to lay assistance at trial or on appeal); *Simmons v. Carter*, 576 N.E.2d 1278, 1279 (Ind. Ct. App. 1991) (holding that while any natural person may appear in court on his or her own behalf, only licensed attorneys may appear on behalf of other persons).

[26] The record is replete with admonishments to Mr. Deignan. It is my opinion that the trial court extended every courtesy and went the extra mile to accommodate him. This courtesy was rebuffed by insults, obvious sarcasm, and the outright ignoring of the court's requests. The evidence tells me Mr. Deignan was in contempt. *See Hopping v. State*, 637 N.E.2d 1294, 1296 (Ind. 1994), (holding that direct contempt involves disobedience of a court that undermines the court's authority, justice, and dignity, of which the judge has personal knowledge), *cert. denied*; *Carroll v. State*, 54 N.E.3d 1081, 1086 (Ind. Ct. App. 2016) (holding disruptive defendant who appeared in court via video was properly held in direct contempt); *Johnson v. State*, 426 N.E.2d 104, 106 (Ind.

Ct. App. 1981) (holding that parties must comply with even allegedly erroneous orders and rulings or they may be held in contempt for violating them).

[27] I understand my colleagues' perspective. I respectfully disagree with it, but do agree the correct result was achieved. I fully concur with respect to Section 2.