## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 20 2018, 10:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald J. Moore
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Stephen A. Via,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 20, 2018<br><br>Court of Appeals Case No.<br>89A05-1704-CR-931<br><br>Appeal from the Wayne Circuit Court<br><br>The Honorable David A. Kolger, Judge<br><br>Trial Court Cause No.<br>89C01-1606-MR-1 |

**Riley, Judge.**

# STATEMENT OF THE CASE

[1]     Appellant-Defendant, Stephen Via (Via), appeals his conviction and sentence for murder, a felony, Ind. Code § 35-42-1-1.

[2]     We affirm.

# ISSUES

[3]     Via presents three issues on appeal, which we restate as:

(1) Whether the State presented sufficient evidence beyond a reasonable doubt to support Via's murder conviction;

(2) Whether the trial court abused its discretion by admitting evidence of Via's prior bad acts under Ind. Evidence Rule 404(b); and

(3) Whether Via's sentence is inappropriate in light of the nature of the offense and his character.

# FACTS AND PROCEDURAL HISTORY

[4]     In October of 2014, Via and Stacy Mosier (Mosier) began dating. Shortly thereafter, Via moved into Mosier's residence in Richmond, Indiana. On the morning of June 16, 2016, Jamie Tuttle (Tuttle) went to Mosier's home and informed Mosier that he had a cleaning job lined up for Mosier. Tuttle and Mosier then left in Tuttle's vehicle. Sometime that morning, Via readied himself and went to his grandfather's house to pick up his daughter to spend time with her. At 2:21 p.m. Via texted Mosier, "So what's up." (State's Exh. 156). After having not heard back from Mosier, Via sent another text to Mosier

at 2:55 p.m. stating, "Déjà vu guess I'll see you when I see you." (State's Exh. 155). At about 3:00 p.m., Via dropped off his daughter at his grandfather's house. Via spent the rest of his day next door, at his father's ("Father") house. When Via returned home later that night, Mosier was not there.

[5] Shortly before 8:00 a.m. on June 17, 2016, Susan Groff (Groff), Mosier's neighbor, took her dogs out. Groff saw Mosier arrive at her home, and after Mosier went inside, Groff heard "lots of screaming and hollering." (Tr. Vol. III, p. 125). Groff then heard "[l]ike a door slamming. Bam." (Tr. Vol. III, p. 125). Via's cell phone call logs show that Via called Father at around 7:50 a.m. and the call lasted 90 seconds. Via again called Father at 8:01 a.m. and the call lasted 53 seconds. Via made another call at 8:02 a.m., but Father did not answer. At 8:04 a.m., Father texted Via, "Hurry up, we got work to do." (Tr. Vol. III, p. 207). Moments later, Groff saw Mosier's white Pontiac drive off; however, she could not see who was driving because of the vehicle's tinted windows.

[6] At approximately 8:30 a.m., David Stein (Stein), a neighbor to Father, was leaving work. Stein saw Via standing in Father's backyard, and he was surprised to see Via because he knew Via was a "late sleeper." (Tr. Vol. II, p. 190). Stein asked Via, "[W]hat are you doing up so early?" and Via stated that he wanted to give "[Father] a lift." (Tr. Vol. II, p. 190). Meanwhile at Mosier's home, Groff did not see Mosier's vehicle, nor did she see other people visit the home. Mosier had previously disclosed to Groff that she and Via were undergoing relationship problems and Mosier had hoped that going camping

with Via might "get their relationship fixed." (Tr. Vol. III, p. 127). Groff thought it was odd for Mosier and Via to go camping and leave all the windows to their home open. At some point, Groff walked over to Mosier's house, peeked through a broken window, and called out for Mosier's dog. Because she did not hear Mosier's dog bark, Groff believed that Via and Mosier had gone camping.

[7] That same day, at 11:48 a.m., Via texted Mosier's phone saying, "WTF where you at? This is bullshit. You keep running around getting high and just doing whatever you want, wherever you want. You're so selfish. You always blame everyone else for all your problems. You need to take responsibility for something or nothing will ever get better." (State Exh. 154). Later that day, at about 4:00 p.m., Via saw his best friend, Dillion Morefield (Morefield), standing at a corner, and he stopped to give Morefield a ride in Mosier's white Pontiac. After Morefield got inside the vehicle, he sensed that Via was nervous about something. Morefield inquired as to how Mosier was doing, and Via stated, "she's fine." (Tr. Vol. III, p. 47). Morefield was in the car with Via and Father for around ten minutes before exiting.

[8] At approximately 4:30 p.m., Father saw his friend, Laura Turner (Turner), driving her car and he called Turner on her cell phone. Turner agreed to meet Via and Father at a Big Lots' parking lot. Upon arriving at the agreed location, Father exited the vehicle being driven by Via and entered Turner's vehicle. Father began crying. Turner had "never seen a grown man so out of control of his emotion." (Tr. Vol. I, p. 78). Father indicated that "he needed a friend. He

needed somebody to help him. Something bad [had] happened." (Tr. Vol. I, p. 78). Because Turner had to rush to the BMV to get a "new I.D. card," Via drove behind Turner. (Tr. Vol. I, p. 157). After Turner was done with the BMV, Via followed Turner's vehicle to a drug house, where all three "smoked some crack." (Tr. Vol. I, p. 65).

[9] A short while later, all three left the drug house in Turner's vehicle, and because Father and Via wanted a hotel room, Turner drove the pair to a Super 8. Turner believed that Via and Father "wanted privacy" to talk about something. (Tr. Vol. I, p. 84). At about 6:30 p.m., Turner had to leave for work, but she left with the expectation that Father and Via would disclose "whatever this whole thing was all about." (Tr. Vol. I, p. 89). Turner returned to the motel room at about 9:30 p.m. Via then disclosed to Turner the events of the day. Via informed Turner that Mosier had upset him that day for staying "out all day and all night" with Tuttle. (Tr. Vol. I, p. 93). Via indicated that Mosier "knew how to push his buttons." (Tr. Vol. I, p. 93). Via divulged that when Mosier arrived home, they argued and "they both went upstairs into the bedroom." (Tr. Vol. I, p. 96). Via stated that he had a gun in his hand during the altercation and that he pointed it toward Mosier's head. At that moment, Via voiced to Mosier, "I told you I'd kill you." (Tr. Vol. I, p. 96). Via articulated to Turner that without his involvement, the "gun just went off" and killed Mosier. (Tr. Vol. I, p. 96). Turner observed that Via had "blood on [his] boots." (Tr. Vol. I, p. 104). Turner observed that Via lacked any emotions during his narration.

[10] While Via was narrating the events, all three were "[s]moking crack" and thereafter Via began strategizing on "what to do next." (Tr. Vol. I, p. 102). Via suggested possibly framing Tuttle. Also, Via proposed to "get rid of the gun" by throwing it in a pond. (Tr. Vol. I, p. 103). Turner observed that after Via took a shower, Via remained dressed in his underwear and he handed Father all the clothes that he had been wearing that day. Father subsequently put Via's clothes and Via's boots in a plastic bag. At some point, Turner informed Via and Father that she had to go home. Father accompanied Turner. As Turner was driving eastbound on Interstate 70 (I-70), she "heard [her] back window go down and [she] heard something fly out the window." (Tr. Vol. I, p. 108). Thereafter, Father instructed Turner to exit I-70 and to drive to a gas station which had a Salvation Army donation box in the parking lot. There, Father dropped a plastic bag containing Via's clothes. Turner drove Father back to the hotel and thereafter went home.

[11] Unbeknownst to Via and Father, Turner was a confidential informant. On June 18, 2016, Turner contacted Chief James Branum (Chief Branum) of the Richmond Police Department and informed him that she needed to talk to him. Chief Branum advised Turner to drive to the police station. On her way, Turner noticed a tackle box and fishing poles in the backseat of her car. When she arrived at the station, Turner reiterated Via's confession, as well as Via's subsequent actions and proposals of concealing any evidence relating to Mosier's murder. Turner relayed to the officers that the murder weapon might have possibly been left inside her vehicle.

[12] Following a search of Turner's vehicle, the officers located a .380 semi-automatic gun inside the fishing tackle box. A magazine was also located in the tackle box. The magazine contained three .380 bullets, but there were no shell casings. There was blood on the barrel end of the gun, which was later identified as Mosier's. The officers also went to the gas station which had a Salvation Army donation box to search for more evidence. Inside the box, the officers recovered Via's shorts, gray belt, and a Cincinnati Reds baseball club t-shirt. In a trash dumpster behind the gas station, the officers found a vest covered in reddish-brown stains. The brown stains were later identified as blood belonging to Mosier. The officers also searched along I-70 and found Via's boot. Mosier's blood was found in approximately six points on Via's boot. After the officers obtained a search warrant, they located Mosier's body in an upstairs bedroom of her home. Mosier had been shot in the head and was lying in a pool of blood. There was no blood on the bed or bedding. An expended bullet was found next to Mosier's body. Rafael Perez (Perez), a forensic firearm examiner with the Indiana State Police Laboratory Division, determined that the spent bullet had been fired by the gun located in the tackle box inside Turner's vehicle.

[13] On June 20, 2016, the State filed an Information, charging Via with murder, a felony. On February 13, 2017, the State filed notice of its intent to introduce evidence under Indiana Evidence Rule 404(b) consisting of Via's previous batteries against Mosier, and Via's prior death threat to Mosier. On February 17, 2017, Via filed a motion *in limine* requesting the exclusion of his specific

prior bad acts. On February 22, 2017, the State filed an amended notice seeking to include additional bad acts that had inadvertently been omitted in the initial notice. On the same day, the trial court conducted an evidentiary hearing. Following the parties' arguments, the trial court issued an order, stating in part,

> . . . that any evidence the State of Indiana intends to introduce concerning "previous statements by Stacey Mosier that [Via] battered her, and threatened to kill her, and had injuries obtained from [Via], including observations of Mosier's injuries and Mosier's statements that the injuries came from [Via]" shall be considered at an evidentiary hearing, and/or allowing [Via] to ask preliminary questions of the State's witnesses outside the presence and hearing of the jury.

(Appellant's App. Vol. I, p. 79).

[14] A jury trial was conducted on February 27 through March 3, 2017. At the close of the evidence, the jury found Via guilty as charged. On March 30, 2017, the trial court conducted a sentencing hearing. After the hearing, the trial court sentenced Via to sixty-five years in the Department of Correction.

[15] Via now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Sufficiency of the Evidence*

[16] Via argues that the State failed to present sufficient evidence beyond a reasonable doubt to sustain his murder conviction. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither

reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

[17] Indiana Code section 35-42-1-1(1) provides that "[a] person who: (1) knowingly or intentionally kills another human being . . . commits murder, a felony." A person engages in conduct knowingly when, at the time he engages in the conduct, he is aware of a high probability that he is doing so. I.C. § 35-41-2-2(b). A murder conviction may be sustained on circumstantial evidence alone. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016). Likewise, a trier of fact may infer that the requisite intent for a crime exists based solely on circumstantial evidence: "Knowledge and intent are both mental states and, absent an admission by the defendant, the trier of fact must resort to the reasonable inferences from both the direct and circumstantial evidence to determine whether the defendant has the requisite knowledge or intent to commit the offense in question." *Stokes v. State*, 922 N.E.2d 758, 764 (Ind. Ct. App. 2010).

[18] Via's sole contention on appeal is that his gun was defective which made it possible for the gun to discharge on its own. Thus, Via maintains that he did not knowingly or intentionally kill Mosier. The State responds by arguing that "the totality of the evidence provided the reasonable inference that [Via]

modified the gun to cover up his intentional act" of killing Mosier and he made "the shooting look like an accident." (State's Br. p. 22). We agree with the State.

[19] At his trial, Via stated that he acquired the gun a month before Mosier's murder through a drug sale, *i.e.*, he sold some drugs and received the gun in return. To assess if the gun was properly working, Via "dry fired the gun," but he never used it for target practice, nor did he disassemble or reassemble the gun. (Tr. Vol. IV, p. 59). Although Via owned other firearms, Via indicated that he "frequently" carried the gun in question. (Tr. Vol. IV, p. 60). He stated that the gun was "usually in my pocket. Or if it was in the car, it'd be under[] the frontseat (sic)." (Tr. Vol. IV, p. 60).

[20] Via's version of events on the day Mosier died, was that Mosier arrived home at around 7:00 a.m. and demanded money from him to go "get more cocaine." (Tr. Vol. IV, p. 72). Via rejected Mosier's requests, and the two began arguing. At some point, Via got up from his bed and dressed for the day. Via then gathered his "money, drugs, cigarettes" and "pistol" from the night stand, and he intended to leave the house. (Tr. Vol. IV, p. 73). Via claimed that Mosier held his arm and asked him to "quit being a dick." (Tr. Vol. IV, p. 73). Via pushed Mosier away, and he told Mosier to "get the fuck off." (Tr. Vol. IV. p. 73). Again, Mosier grabbed his arm and in the process, they both fell on the bed at an "angle." (Tr. Vol. IV, p. 73). Via then got on top of Mosier and pointed the gun at Mosier's head. Via warned Mosier "not to touch [him] again," and he slid the gun in an upward manner; however, the "pistol went

off." (Tr. Vol. IV, p. 73). Via claimed that the gun fired without him pulling the trigger. Upon seeing what he had done, Via immediately pulled Mosier to the side of the bed, and while kneeling, momentarily cradled Mosier's head in his arms before she died.

[21] Perez, the forensic firearm examiner who tested Via's gun, explained how the internal parts of a gun naturally operate. Following a detailed description, Perez testified that when he initially inspected Via's gun, he "didn't notice anything out of the ordinary," however, when he "put it down, [he] noticed . . . the retainer was slightly indented . . . into its channel." (Tr. Vol. II, p. 113). He found that it was "a little too easy to push the retainer," a feature that was "uncommon" for a .380 handgun. (Tr. Vol. II, p. 114). Upon further testing, Perez discovered that the "firearm could fire without the trigger being pulled." (Tr. Vol. II, p. 114). Based on his observations, Perez disassembled the handgun and compared the firearm to another firearm from the State laboratory. Perez indicated that he mainly assessed four parts—i.e., the retainer, firing pin, firing pin spring, and sear. With the retainer, he noted that the "small little. . . locking hook" at the bottom of the retainer was bent. (Tr. Vol. II, p. 116). Perez stated that he had "never seen a bent retainer on . . . this class of firearm before." (Tr. Vol. II, p. 129). Perez saw another flaw with the firing pin and he testified that the "back half of the firing" pin also known as a "cocking indicator," stuck out at the back of Via's handgun. (Tr. Vol. II, p. 116). As for the firing pin spring, Perez determined that it had been shortened since some of the "coils were missing." (Tr. Vol. II, p. 117). He attested that

he had never seen a shortened firing pin spring, "[u]nless it was modified on purpose," however, he also attributed the defect to normal "wear" and tear to the gun. (Tr. Vol. II, p. 129). Lastly, Perez observed that the two sears to the gun, which appear on either side of the gun, were "atypical." (Tr. Vol. II, p. 117). Specifically, Perez found that one sear was "real shortened" and the other sear "had a modification of some kind that was not standard." (Tr. Vol. II, p. 117). He testified that he had "never seen a sear that was shortened and modified so that the safety would not work." (Tr. Vol. II, p. 130). Perez testified that the flaws he detected negatively affected the triggering mechanism in Via's gun. As such, Perez determined that Via's gun could be fired without pulling the trigger in three ways—a slam fire, by being dropped, or if one applied force to the slide of the gun in an upward manner if the gun was already cocked. Perez noted that under all three scenarios, however, the gun would "require a human being to manipulate it somehow" in order for it to discharge. (Tr. Vol. II, p. 127).

[22] Notwithstanding his above discernment that the defects may have been a result of the gun's normal wear, Perez testified that the shortened sear and shortened firing pin spring could have been altered by "metal clippers" or a "special cutting tool." (Tr. Vol. II, pp. 131-32). The jury heard evidence that Via was a former welder and familiar with the types of tools that may have been used to make modifications to the gun. The State also presented evidence of Via's comprehensive knowledge about guns, thereby promulgating a notion to the jury that Via may have altered his handgun to foster an impression that the gun

accidentally fired and that he did not intentionally shoot Mosier. As a child, Via's grandfather took Via for target practice with rifles and handguns. Via's love for guns proceeded into his adult life, and he testified that he would target practice with his best friend Morefield using semi-automatic handguns. Via owned an AK-47 which he used for target practice, and he also knew how to clean, take apart, and reassemble. The State additionally presented evidence that Via was formerly in the National Guard and had completed basic training in firearms prior to being discharged from the Army in 2009. As part of his Army training, Via received a manual that had instructions on how to disassemble a handgun. Based on Via's extensive knowledge about guns, the jury could have reasonably inferred from the evidence that Via modified the gun so as to make Mosier's murder appear as an accident. Furthermore, Via testified that he frequently carried the gun in his pocket and under the front seat of his car a month prior to Mosier's murder. Given that the gun had not inadvertently fired on its own in the month prior to Mosier's murder, it is unlikely that the gun had any of the described defects prior to the shooting. In light of the foregoing facts, it was reasonable for the jury to infer that Via had motive, ability, skill, and opportunity to modify his gun in order to make it more susceptible to defective firing, and thereby make Mosier's shooting seem like an accident.

[23]     Moreover, we note that a murder conviction may be sustained on circumstantial evidence alone. *Sallee*, 51 N.E.3d at 134. Via's subsequent actions after shooting Mosier additionally lead us to conclude that Via

knowingly or intentionally killed Mosier. Via's cell phone call logs showed that he called Father three times between 7:50 a.m. and 8:01 a.m. At 8:04 a.m., Father texted Via and stated, "Hurry up, we got work to do." (Tr. Vol. III p. 207). Before leaving the house to meet Father, Via used a gray sweatshirt to wipe away his DNA at the crime scene. The record shows that Via sent a text message to Mosier's phone approximately four hours after her death to give the impression that he did not know she was dead. Later that evening, Via confessed to Turner, a confidential informant, that prior to killing Mosier, he pointed the gun at Mosier's head and stated, "I told you I'd kill you." (Tr. Vol. I, p. 97). Via expressed to Turner that "he was very mad and very upset" that Mosier had spent the previous day and night with another man, and that Mosier "knew how to push his buttons." (Tr. Vol. I, p. 98). Via proposed framing somebody else for the murder, and getting rid of any incriminating evidence, including the gun which he intended to throw into a pond. Via's gun was later found in Turner's car inside a fishing tackle box. With the help of Father, Mosier also got rid of his shoes, and all the clothes he had worn during the shooting.

[24] Via's version of events also did not match the physical evidence, thus allowing the jury to reasonably infer that he was lying about Mosier's shooting being an accident. Although Via claimed the gun inadvertently shot Mosier as she lay on the bed, no blood was found on the bedding. Via additionally claimed that after he and Mosier fell on the bed, Mosier was lying on her back with her head facing the right side. Mosier's autopsy showed that the trajectory of the bullet

travelled from "left to right, back to front, [] slightly upward" and exited through the right temple. (Tr. Vol. II, pp. 24-25). Thus, if the bullet travelled from left to right, it would have gone down into the bed if Mosier was lying on her back. Lastly, the evidence that Via and Mosier had a toxic relationship, and were engaged in an escalating altercation when Via pointed his gun at Mosier, provided a further motive for the shooting.

[25] In the instant case, Via's in-depth knowledge about guns and his welding skills created reasonable inferences that he altered his gun after killing Mosier. Moreover, the State presented adequate circumstantial evidence that led the jury to conclude that Via had the requisite *mens rea* for the crime of murder. Specifically, Via took substantial steps in concealing any incriminating evidence after he killed Mosier. Also, his version of events did not tie to the physical evidence collected at the crime scene. Lastly, Via was upset that Mosier had stayed out all night the night before, and the two were engaged in an altercation before Via shot Mosier in the head. Here, the totality of the evidence leads us to conclude that the State proved beyond a reasonable doubt that Via knowingly and intentionally killed Mosier.

## II. *Admission of Prior Bad Act Evidence*

[26] Referencing Indiana Evidence Rule 404(b), Via contends that the trial court abused its discretion in admitting cumulative prior bad acts of domestic violence between him and Mosier.

[27] Our standard of review for the admissibility of evidence is well established. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Timberlake v. State*, 690 N.E.2d 243, 255 (Ind. 1997), *reh'g denied*, *cert. denied*. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. However, if a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." *Timberlake*, 690 N.E.2d at 255. Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. *Stephenson v. State*, 742 N.E.2d 463, 481 (Ind. 2001), *cert. denied*.

[28] Indiana Evidence Rule 404(b) provides, in pertinent part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

[29] When a defendant objects to the admission of evidence on the grounds that it would violate Rule 404(b), the following test is applied: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its

prejudicial effect pursuant to Rule 403. The rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so-called 'forbidden inference.'" *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004), *trans. denied*.

[30]    In this case, during opening remarks, Via's counsel presented a claim of a *contrary intent*, *i.e.*, Via's gun had a defect which caused it to accidentally discharge on its own. If true, this would have negated an essential element for the crime of murder, *i.e.*, Via did not knowingly or intentionally kill Mosier. Based on that presentation, during trial, the trial court permitted the State to respond by offering evidence of prior crimes, wrongs, or acts to the extent generally relevant to prove that Mosier's shooting was not accidental as claimed by Via; rather, it was intentional. *See Lafayette v. State*, 917 N.E.2d 660, 663 (Ind. 2009).

[31]    During the trial, the State proffered testimony from Turner that a month prior to Mosier's death, Mosier had told Turner that Via had battered her. Stein, Father's neighbor and a friend to Mosier, testified that a few weeks before Mosier's death, he saw Via and Mosier arguing. Following that argument and referring to Mosier, Via expressed to Stein, "[M]an, she's pushing my buttons. . . . She's making me crazy." (Tr. Vol. II., p. 199). Stein further added that a couple of weeks before Mosier's murder, he was fixing the brakes on Mosier's car and he observed a dent to the side of the car. When Stein asked Mosier what had happened, Mosier reported that during an argument, Via had "thrown a rock or a brick or something and hit the side of the car." (Tr. Vol.

II., p. 170). When Stein confronted Via about the car-dent incident, Via's response was that Mosier had charged at him with a baseball bat, and Via stated that he had to defend himself. Stein additionally testified that Via admitted to having "smacked [Mosier] around." (Tr. Vol. II, p. 181). Morefield, Via's best friend, testified that three weeks prior to Mosier's murder, Mosier had informed him that Via had bruised her rib and given her a black eye. Mosier's Mother, Connie Sawyer (Sawyer), testified that in January of 2016, she started observing injuries on Mosier including "black eyes, busted up ribs . . ., bruising up and down one leg." (Tr. Vol. III, pp. 111-12). Sawyer stated that Via had also rammed Mosier's keys into her palm during an argument, and Mosier had a visible "hole" in her palm. (Tr. Vol. III, p. 111). Groff, who lived across the street from Mosier, testified that Mosier pursued her help after the palm injury and that she took Mosier to the Urgent Care for medical treatment. (Tr. Vol. III, p. 129). On another occasion, Groff observed bruises on Mosier's rib cage, and Mosier confessed to Groff that Via had hit "her with a bat." (Tr. Vol. III, p. 129).

[32] The State also argues that numerous domestic abuse incidents were properly admitted as relevant evidence of motive and relationship between Via and Mosier. We agree. As our supreme court held in *Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996), "[a] defendant's prior bad acts are . . . usually admissible to show the relationship between the defendant and the victim." *See also Elliott v. State*, 630 N.E.2d 202, 204 (Ind. 1994) (prior threats of violence to ex-wife and victim admissible to show the relationship between the parties and defendant's

motive); "Hostility is a paradigmatic motive for committing a crime." *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997) (citations omitted).

[33] Here, we find that the above domestic incidents were probative of the hostile relationship between Via and Mosier. Moreover, on the day Mosier died, Via was angry with Mosier since she had spent the previous day and night out. Evidence was presented that Via had suspected Mosier of having an affair at the time. Via confessed to Turner that prior to shooting Mosier, he pointed the gun at Mosier's head and stated, "I told you I'd kill you." (Tr. Vol. I, p. 97). Via expressed to Turner that prior to the shooting, "he was very mad and very upset" and that Mosier "knew how to push his buttons." (Tr. Vol. I, p. 98). Based on the facts, we find that the evidence relating to the domestic abuse and discord was illustrative of Via's relationship with Mosier, and the evidence was highly germane to prove Via's motive for Mosier's murder.

[34] Although the evidence relating to domestic discord and abuse was relevant to show intent, motive, and the hostile relationship between Via and Mosier, it may still be inadmissible under the second prong of the 404(b) test if its probative value is substantially outweighed by the danger of unfair prejudice pursuant to Evid. R. 403. *See Hicks*, 690 N.E.2d at 221. When inquiring into relevance, the trial court "may consider any factor it would ordinarily consider under Rule 402." *Id.* Such factors include the similarity and proximity in time of the prior act, as well as tying the prior act to the defendant." *Id.*

[35]     The State argues, and we agree, that the trial court properly balanced the evidence against its prejudicial effect by limiting the amount of admissible character evidence. In this case, Via affirmatively asserted in his opening argument that the gun accidentally shot Mosier without his intervention, thereby putting at issue the '*intent*' element of the murder offense. Intent is one of the elements which the State must establish to prove murder under Indiana Code section 35-42-1-1. As such, extrinsic evidence that Via had in the six months prior to Mosier's murder physically abused Mosier, was relevant to challenge the impression that Mosier's murder was accidental. Further, we find that the domestic abuse incidents were close enough in time to maintain a probative force in establishing a pattern of hostility leading up to Mosier's murder. Also, we find that the trial court was within its discretion in finding that evidence relating to domestic abuse, discord, and Via's death threat toward Mosier, illustrated Via's motive for Mosier's murder. As such, we cannot say that the probative value of prior bad acts outweighed the danger of unfair prejudice to Via. Consequently, we conclude that the trial court did not abuse its discretion by admitting Via's prior bad acts under Evid. R. 404(b).

### III. *Sentencing*

[36]     Lastly, Via contends that the trial court abused its discretion when it imposed a sixty-five-year sentence for murdering Mosier. Indiana Appellate Rule 7(B) empowers us to independently review and revise sentences authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the

offender. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, while the "character of the offender" permits a broader consideration of the defendant's character. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008); *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). An appellant bears the burden of showing that both prongs of the inquiry favor a revision of his sentence. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id.*

[37] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). A person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. I.C. § 35-50-2-3. Here, the trial court imposed the maximum sentence under the statute.

[38] Via concedes that the nature of his offense does not warrant a sentence revision under Rule 7(B). Indeed, the nature of the offense was egregious. The record shows that Via was upset with Mosier for spending the previous day and night out with another man. When Mosier finally returned home, the two argued, and during a heated altercation, Via pointed his gun at Mosier and he

threatened to kill her. Via then fulfilled his promise by shooting Mosier in the head. Accordingly, we hold that the nature of Via's offense does not justify a sentence revision.

[39] When considering the character of the offender, one relevant fact is the defendant's criminal history. *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007). The significance of a criminal history in assessing a defendant's character varies based on the gravity, nature, and number of prior offenses in relation to the current offense. *Id*. While a record of arrests may not be used as evidence of criminal history, it can be "relevant to the trial court's assessment of the defendant's character in terms of the risk that he will commit another crime." *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005).

[40] At his sentencing hearing, the trial court took note of Via's prior contacts with the criminal justice system. In 2000, as a minor, Via was arrested for possessing marijuana. Six months later, he was arrested for battery, and two weeks later, for intimidation. While on an informal adjustment for the battery offense, he was arrested for failing to attend school and being disobedient. Via's informal adjustment was extended, but he was thereafter arrested for a theft and attempted burglary. While a delinquency petition was pending for the theft and burglary offenses, Via was arrested for disorderly conduct, and minor consuming alcoholic beverage. Via was placed on probation for a year in 2003 for the theft and burglary offenses. In three separate incidents in 2004, Via was arrested for theft, minor consuming alcoholic beverage, and possession of paraphernalia. Via picked up his first adult conviction in 2005 for operating a

motor vehicle while intoxicated. In 2007, Via was convicted of minor consuming alcoholic beverage. In 2009, while armed with a firearm in Ohio, Via committed aggravated burglary and aggravated robbery. Via was subsequently convicted and sentenced to a term of six years.

[41] Via's substance abuse also reveals that he has not led a law-abiding life. Via admittedly stated that he began drinking alcohol at age fifteen, at which time he would drink on the weekends. At age fourteen, Via began smoking marijuana and would smoke from "time to time." (Appellant's App. Vol. II, p. 146). Via's last reported use of marijuana was in 2016. Following his release from the Ohio DOC for the aggravated burglary and aggravated robbery offenses, Via indicated that he abstained from using marijuana while on probation because it stayed for a longer period in his system. Therefore, to sustain his drug addiction while on probation, Via "began using heroin because it only stayed in his system for a couple of days." (Appellant's App. Vol. II, p. 146). At his sentencing hearing, Via admittedly stated that was using cocaine at the time he committed the crime, and as a drug dealer, he sold heroin. The gun that Via used to shoot Mosier had been obtained during a drug sale. Here, we conclude that Via has failed to establish that his sentence is inappropriate in light of the nature of the offense and his character, and we affirm the trial court's imposition of a sixty-five-year sentence.

## CONCLUSION

[42] In sum, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support Via's murder conviction. Also, we conclude that

the trial court did not abuse its discretion in admitting evidence relating Via's prior bad acts under Evid. Rule 404(b). Finally, we conclude that Via's sentence is not inappropriate in light of the nature of the offense and his character.

[43] Affirmed.

[44] Baker, J. and Brown, J. concur