## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 10 2020, 11:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Christopher Kunz
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Fransuah Mathews,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 10, 2020

Court of Appeals Case No.
19A-CR-2436

Appeal from the Marion Superior Court

The Honorable Barbara Crawford, Judge

Trial Court Cause No.
49G01-1804-MR-13496

**Baker, Senior Judge.**

[1] Fransuah Mathews appeals his convictions for Murder[1] and two counts of Level 1 Felony Attempted Murder,[2] arguing that the trial court erred by (1) denying his motion for a mistrial, and (2) not allowing him to cross-examine a certain witness, thereby violating his rights under the Sixth Amendment. Finding no error, we affirm.

## Facts

[2] In April 2018, Bradley Jones was dating Kylie Price. The couple lived with Ralph Jones, Bradley's father, on the west side of Indianapolis. On April 19, 2018, Ralph, Bradley,[3] and Price ran errands together and then drove to the Clover Leaf Apartments, where Ralph met with and picked up Anthony Smith, a friend Ralph had known for several years. That day, Ralph was driving a Crown Victoria with cash on hand to buy a vehicle for Bradley and Price. Ralph also had a .357-caliber handgun that day that he planned to use as collateral when purchasing the vehicle.

[3] Once Ralph picked up Smith, the plan was to then go see a vehicle that Mathews had for sale. Mathews was a neighbor of Smith's, and Ralph knew Mathews from previous encounters. Smith got into the front passenger seat of Ralph's vehicle and told him to follow Mathews, who was driving Smith's

---

[1] Ind. Code § 35-42-1-1.

[2] *Id.*; Ind. Code § 35-41-5-1(a).

[3] Because Bradley and Ralph have the same last name of Jones, we refer to each by their first name throughout the opinion for the sake of clarity.

vehicle. Bradley and Price were sitting in the backseat, with Price on the driver's side and Bradley on the passenger's side. After the group stopped at a gas station, Smith directed Ralph to drive to a house at 1229 Manhattan Avenue, where Mathews had parked Smith's vehicle out front. Ralph told Bradley and Price to wait in the car as he and Smith walked around to the back of the house, where the cars for sale were located.

[4] Next, Ralph walked up to the vehicle he believed to be for sale and saw Mathews doing work under the hood. Mathews told Ralph that he was changing the plugs on the vehicle. Ralph "didn't like the vibes he got" from Mathews and decided he "didn't like the looks of the car anyways," and told Mathews he was no longer interested in buying the vehicle. Tr. Vol. III p. 73. As Ralph turned away, Smith grabbed the back of his shirt and said "just give us the money, Ralph," at which point Smith and Mathews "jumped" him. *Id.* They both beat Ralph before Smith fired his revolver at Ralph, shattering the bone in Ralph's right arm. Ralph was shot four more times while he was face down on the ground; they also took his wallet and cash.

[5] Meanwhile, still in the backseat of Ralph's Crown Victoria, Bradley heard "four or five" gunshots but was unable to tell where they were coming from. Tr. Vol. II p. 233. Smith and Mathews then "surround[ed]" the Crown Victoria, with Smith at the passenger side and Mathews on the driver's side, and began "shooting up the back two windows of the car." *Id.* at 235. Bradley was unable to clearly see them holding guns and shooting, but saw "bright flashes on both sides of [him]" being fired at the same time. *Id.* Next, Bradley saw Smith enter

the passenger side of Smith's car and Mathews enter the driver's side before Mathews quickly drove away.

[6] When responding officers arrived at the scene a few minutes later, Bradley was still in the backseat of the Crown Victoria and Price was found outside the vehicle, "slumped over on her knees with her head up against the driver's side rear tire." *Id.* at 103. Both Bradley and Price were critically injured; Price had two gunshot wounds in her shoulder and was in and out of consciousness and Bradley appeared to have several gunshot wounds in his back and chest and was "barely breathing." *Id.* at 104. Within a few more minutes, officers also discovered Ralph behind the house, and he was also in critical condition.

[7] Price died a short time after arriving at the hospital. One gunshot had entered her left shoulder and passed through her heart and right lung, and the second gunshot entered the right side of her pelvis and through to her buttock. Both bullets were recovered from her body. The cause of death was determined to be gunshot wounds and the manner of death was determined to be homicide. Bradley's injuries left him in the hospital for a month, and he still has a bullet in his right shoulder that causes him daily pain and has the potential to cause paralysis in the future. Ralph was hospitalized for three months, eleven weeks of which he was in a coma. The shooting and mugging caused a severed spine and sciatic nerve, causing him to be paralyzed from the waist down; he is now wheelchair bound. His right arm is also held together by plates and rods. Three of the bullets remain inside Ralph's body.

[8] At some point following the shooting, detectives interviewed Bradley and Ralph and had them identify Smith and Mathews from photo arrays. Bradley also described the location and appearance of Smith's and Mathews's apartments. Detectives executed a search warrant at Mathew's apartment that revealed the .45 caliber semi-automatic handgun that fired the two bullets removed from Price's body and the four shell casings found in the front and back yard of 1229 Manhattan Avenue. They also found Mathew's fingerprint on an ammunition box located next to the safe where the .45 caliber firearm was held. At 1229 Manhattan Avenue, officers recovered a cigarillo in the backyard near where Ralph was shot, and Smith's DNA was identified on the tip of the cigarillo.

[9] Mathews also voluntarily gave a statement to detectives, during which he admitted that he owned a .45 caliber handgun that he kept in a safe and stated that Smith was his friend and neighbor. Mathews admitted to being at 1229 Manhattan Avenue when the shooting occurred, but claimed that he arrived with Smith at 1229 Manhattan Avenue the day of the shootings and that Smith had been driving and parked the car and got out and told Mathews he would be right back. Mathews then claims to have heard gunshots and saw Smith return and fire a gun at the vehicle parked behind him, first on the driver's side and then on the passenger's side, after which Smith got back in the car with Mathews and drove away.

[10] On April 25, 2018, the State charged Mathews with one count of murder, one count of felony murder, two counts of Level 1 felony attempted murder, two

counts of Level 2 felony robbery, and two counts of Level 3 felony aggravated battery. On August 21, 2019, the State amended the charging information by correcting language to one of the Level 2 felony robbery charges and dismissing the other robbery charge.

[11] A jury trial was held August 26-28, 2019. At trial, during the State's direct examination of Ralph, Ralph was asked several times to look around the courtroom and identify Mathews and failed to do so. After the State asked Ralph a second time whether he had "looked at every face" in the courtroom, tr. vol. III p. 70, Mathews objected on the basis that the question had been asked and answered, and the trial court sustained the objection. Ralph continued to testify on direct and then cross-examination. Counsel then stood at the bench to discuss jury questions. It was during this time, as Ralph would later testify, that Ralph looked over and noticed and recognized Mathews sitting at the table with the attorneys. The jury questions were then asked and answered, and the trial court released Ralph.

[12] As the deputy prosecutor started to wheel Ralph away from the stand and out of the courtroom, Ralph informed him that he had recognized Mathews. As a result, the State asked to recall Ralph as a witness. Ralph then identified Mathews's location in the courtroom and accurately described the clothes he was wearing. Mathews objected to the identification and alleged that someone in the gallery had pointed Mathews out to Ralph. Mathews asked Ralph the following preliminary questions:

MATHEWS: Ralph, you were being wheeled out of the courtroom when you made that identification, correct?

RALPH: Yes.

MATHEWS: In fact, your back is to [Mathews's] lawyer?

RALPH: Well, yeah, it was as I was going out.

MATHEWS: Yeah, you were looking over here.

RALPH: What's that?

MATHEWS: You were looking over here.

RALPH: At first, yes, I did look out there.

MATHEWS: And these people, did they point over here?

RALPH: No one pointed nothing to me. I noticed him as we were talking as you got up. When you got up is when I recognized [Mathews].

MATHEWS: When you were moving past them towards the people in the gallery?

RALPH: I recognized him before that. Before when he started questioning, when he stood up is when I recognized him sitting there. I got a good look at him out, while I was looking at you, I got to take a good look, to recognize that is [Mathews].

Tr. Vol. III. p. 104-05.

[13]   The State requested that the parties approach the bench and a hearing ensued outside the presence of the jury. The trial court heard testimony from Caitlin Brown, an attorney with the Marion County Public Defender Agency, who had been observing in the gallery. She testified that after being wheeled past the defense table, Ralph looked at Erica Cullison, a woman seated in the gallery, and that she saw Cullison "pointing with her finger discreetly" at Mathews and mouthing "that's him." *Id.* at 107-08. From where Brown was seated in the back row, she was able to see a partial profile of Cullison, who was seated at the front left of the gallery. Brown then stated that it was after Ralph saw Cullison's gestures that he told the State he recognized Mathews.

[14]   Next, the trial court heard testimony from Cullison. She testified that she was Price's mother and that she had dated Ralph about twelve years prior. Cullison denied pointing at Mathews, stating that she "recall[ed] turning in [her] chair, so [Ralph] wouldn't say [sic] or talk to me. But I didn't make any gestures or used [sic] any of my fingers." *Id.* at 113. She claimed that she did so in a deliberate attempt to avoid any eye contact with Ralph to avoid hearing more apologies from him about her daughter's death. *Id.* at 114. She also confirmed that she had been present in the courtroom during questioning when Ralph had failed multiple times to identify Mathews.

[15]   After hearing from Cullison, Mathews moved for a mistrial, citing "conflicting evidence" as to Mathews's identity, which he argued was a "very big issue" of the trial; the State objected to the mistrial, arguing instead that identity was not at issue. *Id.* at 116. The trial court denied the motion for mistrial and overruled

Mathews's identification objection made before the jury was dismissed, reasoning that the trial court had not seen Cullison make any gestures and was "not sure whether [the pointing] happened or not." *Id.* at 117-18. The trial court also noted that when Ralph had been asked multiple times to look around the courtroom and identify Mathews, the trial court observed Ralph "not concentrating on seeing the whole room" and "never once saw him really look at any of the rest of you while sitting at the Defense table or even on that side of the room." *Id.* at 117.

[16] The trial court then asked Ralph if he had made eye contact with anyone as he was wheeled away from the stand, and Ralph denied having done so. Instead, he testified that while counsel stood at the bench to discuss the jury's questions with the trial court, he looked over and saw and recognized Mathews sitting at the attorney's table. Ralph said that he "wasn't expecting him, honestly, to be sitting up over there. I was expecting him possibly out and about somewhere else. I didn't expect him to be up here on the desk with anybody else." *Id.* at 119. Deputy Prosecutor Shana Harris also testified that during that same time Ralph claims to have finally recognized Mathews—while counsel was at the bench discussing jury questions—she "noticed [Ralph] glaring at [Mathews]." *Id.* at 120-21.

[17] At the conclusion of this lengthy discussion, the State noted that it was now Mathews's turn for re-cross examination, and the trial court agreed and called the jury back in. Once the jury returned, the trial court informed the jury that the objection to identification that they heard just prior to being dismissed had

been overruled; the trial court avoided "going . . . into a whole lot of detail about it" to avoid drawing extra attention to it. *Id.* at 122-23. The trial court then released Ralph as a witness and Mathews did not request to re-cross examine Ralph or object to his release.

[18] At the conclusion of the trial, the jury found Mathews guilty as charged. At the sentencing hearing held September 13, 2019, the trial court merged the verdicts and entered judgment of conviction for murder and both counts of Level 1 felony attempted murder. The trial court imposed a sixty-year sentence for the murder of Price, a concurrent sentence of thirty-five years for the attempted murder of Bradley, and a consecutive sentence of thirty-five years for the attempted murder of Ralph, for an aggregate ninety-five-year term. Mathews now appeals.

## Discussion and Decision

## I. Motion for Mistrial

[19] Mathews's first argument on appeal is that the trial court erred when it denied his motion for a mistrial. Our standard of review for such cases is as follows:

> A trial court has discretion in determining whether to grant a mistrial, and this decision is afforded great deference on appeal because the trial court is in the best position to gauge the surrounding circumstances of an event and its impact on the jury. To succeed on appeal from the denial of a motion for mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. The gravity of the peril is determined by considering

the probable persuasive effect of the misconduct on the jury's decision, not the degree of impropriety of the conduct. The appellant carries the burden to show no action other than a mistrial could have remedied the perilous situation into which he was placed.

*Gregory v. State*, 540 N.E.2d 585, 589 (Ind. 1989).

[20] Mathews contends that the trial court erred by denying his motion for mistrial after allowing the State to re-call Ralph to the stand "for the sole purpose of re-asking him if he could identify Mathews," despite the trial court having already sustained an objection to that same question. Appellant's Br. p. 23. As a result, Mathews argues, the trial court allowed the State to deliberately elicit inadmissible testimony, allowed a spectator to influence Ralph's testimony, and ultimately "placed Mathews in a situation where prejudice was inescapable." *Id.*

[21] First, we find that Ralph's identification of Mathews introduced when he was re-called to the stand was not per se inadmissible. Mathews claims that this evidence deliberately went against the trial court's previous ruling sustaining Mathews's asked-and-answered objection to the State's repeated questioning of whether Ralph had looked at everyone in the room and whether he saw Mathews. He argues that this situation is comparable to deliberate and repeated violations of orders in limine to exclude certain evidence. *See, e.g.*, *Gaines v. State*, 456 N.E.2d 1058, 1060 (Ind. Ct. App. 1983) (stating that "deliberate violations of orders in limine by counsel to introduce evidence which prejudices opposing parties may be grounds for a mistrial").

[22] This argument, however, misconstrues the nature of Mathews's original objection. At no point did the trial court order that further identification evidence of Mathews be excluded. Rather, the trial court more narrowly sustained the objection that the State's question—whether Ralph had "looked at every face" in the courtroom and could identify Mathews—had already been asked and answered, which it had. After Ralph had been released as a witness and as he was being assisted out of the court room, he informed the deputy prosecutor assisting him that he had recognized Mathews sitting at the attorney table. When the State re-called Ralph to the witness stand, it did not ask the same question that had been previously ruled as asked and answered. Rather, based on the new information it had just received—that Ralph could, in fact, make the identification—it asked Ralph to testify as to what he had just said to the deputy prosecutor as he wheeled him out of the court room. Ralph then successfully identified Mathews, pointing to him and correctly describing his location and clothing. This testimony, without more, was not inadmissible.

[23] Next, with regard to whether a spectator influenced Ralph's testimony, we again emphasize that the trial court was in the best position to evaluate the circumstances and to "determine the impact of the disruptive events," and that we therefore owe its conclusion substantial deference. *Thomas v. State*, 510 N.E.2d 651, 653 (Ind. 1987). In ruling on the motion for mistrial, the trial court stated:

> Yeah, I'll clarify . . . one of the things I noticed, and I was watching [Ralph] during that time [when he initially failed to

identify Mathews]. I never saw [Ralph] directly look over at your table. I saw him look at everything out there and I saw him look across to the jury. I never once saw him really look at any of the rest of you while sitting at the Defense table or even on that side of the room. So that—one of the reasons I granted that [objection] was, it was clear that [Ralph] was not concentrating on seeing the whole room. And that was one of—and the question had been asked several times. So I granted it because that question had been asked and answered several times and it was clear that [Ralph] wasn't looking over there.

The thing about the pointing, I'm not sure whether that happened or not. Where Ms. Brown was sitting, she may or may not have seen what she testified to and we have the testimony from [Cullison] that she did not make any gestures. I was sitting here watching [Ralph] leave. I didn't see any gestures and I'm facing [Cullison].

Tr. Vol. III p. 117-18.

[24] We find no reason to disturb the trial court's ruling on this matter. As the trial court noted, the evidence presented on whether Cullison pointed and whether Ralph's testimony was influenced by that conduct was inconclusive at best. Furthermore, Ralph later explained why he did not initially see Mathews and that he finally recognized Mathews when counsel approached the bench—earlier than the alleged gesturing and interference by Cullison. This testimony was then corroborated by Harris, who saw him "glaring" and "staring" at Mathews during that same time. *Id.* at 120-21. As such, Mathews has not sustained his burden and "has not shown that the alleged coaching actually influenced any testimony." *Thomas*, 510 N.E.2d at 653 (finding no harm to

defendant and mistrial properly denied where a spectator allegedly coached a witness by nodding and shaking his head during questioning; spectator "was not aware he had made any suggestive gestures" and defendant failed to otherwise show that he was placed in grave peril).

[25] Lastly, even if there had been improper influence by the alleged pointing or if the State had deliberately elicited inadmissible identification testimony, Mathews has failed to show that he was placed in grave peril by Ralph's identification. "The gravity of the peril to the defendant is measured by the conduct's probable persuasive effect on the jury." *Smith v. State*, 140 N.E.3d 363, 373 (Ind. Ct. App. 2020), *trans. denied*. Here, there was ample evidence independent from Ralph's in-court and contested identification of Mathews that Mathews was, in fact, one of the shooters. Ralph had seen Mathews on the day of the shooting at Smith's apartment and at 1229 Manhattan Avenue when he was working on the vehicle for sale, and Ralph later identified Mathews in a photo array in the days after the shooting. Bradley was only able to identify Smith, not Mathews, from a photo array, but was able to tell detectives the exact location where Mathews lived. The .45 caliber handgun owned by Mathews was determined to be the firearm that fired the two bullets that hit and ultimately killed Price and the four shell casings found in the front and back yards of 1229 Manhattan Avenue. Mathews himself even told detectives that he was at 1229 Manhattan Avenue when the shooting took place. Ralph also testified that Smith had his revolver with him that day, which does not eject casings.

All of this evidence supports a conclusion that Mathews was one of two shooters and Mathews fails to show that his identity was at issue such that Ralph's in-court identification placed him in grave peril. As such, the trial court did not err in denying Mathews's motion for a mistrial.

## II. Right to Cross-Examination

Next, Mathews argues that the trial court violated his Sixth Amendment right to cross-examination because Mathews "was not allowed to effectively cross examine Ralph" about the alleged spectator interference after Ralph was re-called to the stand. Appellant's Br. p. 30.

The right to confront witnesses contained in the Sixth Amendment to the U.S. Constitution "includes the right to a full, adequate, and effective cross-examination; it is a fundamental element and essential to a fair trial." *Timberlake v. State*, 690 N.E.2d 243, 255 (1997). However, a defendant waives this right "if, given the opportunity to cross-examine a witness, a defendant does not." *Id.* Our Supreme Court further elaborated on waiver of the right to cross-examine a witness in *Pierce v. State*, 677 N.E.2d 39, 48 (Ind. 1997):

> Exercise of cross-examination is primarily the prerogative of the defendant. In general, failure to request the opportunity to cross-examine a witness at trial called by the opposing party waives the right. As we have stated, "[a] trial judge has no affirmative duty to ascertain whether a defendant is passing up cross-examination because of tactical considerations or through oversight or error." *Webb*, 364 N.E.2d at 1018. The same rule has been applied in the federal courts, and with good reason. It is common knowledge

that a witness called by the other side in any judicial proceeding can usually be cross-examined.

(Some internal citations omitted).

[29] At the conclusion of the hearing outside the presence of the jury, the State stated it had no further questions for Ralph and that "I think this is Defense counsel's recross at this point." Tr. Vol. III p. 122. The trial court agreed and called the jury back in. After asking the State if it had any further questions for Ralph, the trial court excused Ralph from the stand and the State called its next witness. Mathews made no objection or attempt to re-cross-examine Ralph once the trial court announced he was excused.

[30] Despite Mathews's arguments to the contrary, this can hardly be considered an instance of the trial court "not allowing" Mathews to cross-examine Ralph regarding the identification testimony and alleged spectator influence. Appellant's Reply Br. p. 28. Instead, this is a fairly simple and clear-cut instance of Mathews waiving his right to cross-examination. Nothing in the record suggests that Mathews was denied the opportunity to cross-examine Ralph. The trial court and the State both acknowledged that when the jury returned, it would be Mathews's turn to re-cross-examine Ralph if desired. When the trial court excused Ralph, Mathews made no objection or any indication whatsoever that he wished to continue questioning Ralph.

[31] Mathews nonetheless claims that the trial court made clear that it "disapproved," appellant's reply br. p. 9, of Mathews re-cross-examining Ralph after the alleged interference when the trial court stated the following:

> My concern is this: If we bring up [the alleged interference], it's like the elephant in the room. I mean you cannot—once you put this out there and tell the jury there's been a suggestion of improper influence, that is what they're going to concentrate on. And it's going to make this perhaps a bigger issue than it actually is.

Tr. Vol. III p. 121. He contends that the denial of the motion for mistrial and this subsequent statement by the trial court made clear that "any request to cross-examine Ralph regarding the interference would have been futile." Appellant's Reply Br. p. 10.

[32] This statement by the trial court, however, was made as part of discussions on how to approach the identification issue with the jury and whether to admonish the jury and instruct them that the trial court had examined the identification issue and found no improper influence. *See* Tr. Vol. III p. 118-19, 121-22. When the trial court concluded that it would "not . . . go into a whole lot of detail" about the identification and previous objection, neither party objected or requested a further admonishment, nor did such a statement suggest that Mathews would not be able to then proceed with additional questioning. *Id.* at 122.

[33] We therefore decline to find that, given all the facts and circumstances, Mathews's silence constituted anything but a waiver of the opportunity to re-

cross-examine Ralph. *See Webb v. State*, 266 Ind. 554, 555, 364 N.E.2d 1016, 1018 (1977) (finding waiver of right to cross-examine where, after a witness was dismissed from the stand, defendant made no objection or request to cross examine the witness). Mathews's Sixth Amendment right to cross-examine was not violated; he simply waived the chance to exercise it.

[34] The judgment of the trial court is affirmed.

Bradford, C.J., and Pyle, J., concur.